# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| E.I. DU PONT DE NEMOURS AND COMPANY, a Delaware corporation, | ) ) ) |
| Plaintiffs, | ) ) |
| | ) C.A. No. |
| v. | ) ) |
| EQUITY MANAGEMENT,INC. 4365 Executive Drive, Suite 1000 San Diego, CA 92121 | ) ) ) ) |
| Defendant. | ) ) |

## NOTICE OF REMOVAL

Defendant Equity Management, Inc. ("Equity Management") hereby files this Notice of Removal pursuant to 28 U.S.C. §§ 1441 and 1446 and states as follows:

## GROUNDS FOR REMOVAL

1.      On May 28, 2008, Plaintiff E.I. du Pont de Nemours and Company ("DuPont") commenced the present action by filing a complaint in the Superior Court of the State of Delaware in and for New Castle County which was assigned Civil Action No. 08C-05-120-JEF. Equity Management received a copy of the complaint on June 16, 2008.

2.      In the complaint, Plaintiff DuPont seeks damages in the amount of $272,323.72. Thus, the amount in controversy exceeds $75,000.00 exclusive of interest and costs as required by 28 U.S.C. § 1332.

3.      Plaintiff DuPont is a corporation formed under the laws of the State of Delaware with a principal place of business in the State of Delaware. Defendant Equity Management is a corporation formed under the laws of the State of Illinois with a principal place of business in the State of California. As a result, there is a complete diversity of citizenship as the parties are citizens of different states pursuant to 28 U.S.C. § 1332.

4.    This Notice of Removal is accompanied by copies of all process, pleadings, and orders served upon Equity Management in Civil Action No. 08C-05-120-JEB in accordance with 28 U.S.C. § 1446(a).  (Exhibit A).

5.    Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being filed with the Superior Court of the State of Delaware in and for New Castle County and is also being served on Plaintiff DuPont.

6.    The above-captioned action is properly removed to this United States District Court pursuant to 28 U.S.C. §§ 1441(a) and 1446(a).

WHEREFORE, Equity Management hereby removes the above-referenced action commenced against Equity Management in the Superior Court of the State of Delaware in and for New Castle County to this Court.

Jeffrey L. Moyer (#3309)
Moyer@rlf.com
Steven J. Fineman (#4025)
Fineman@rlf.com
Richards, Layton & Finger P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700
Attorneys for Defendant Equity Management, Inc.

Dated:  July 1, 2008

2

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2008, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand Delivered to the following:

> James E. Semple, Esquire
> David J. Soldo, Esquire
> Morris James LLP
> 500 Delaware Avenue
> Suite 1500
> P.O. Box 2306
> Wilmington, DE 19899

I hereby certify that on July 1, 2008, I have sent by electronic mail, the foregoing document to the following non-registered participants:

> Andrew C. Schirrmeister, III, Esquire
> Schirrmeister Diaz-Arrasita Bream LLP
> Pennzoil Place-North Tower
> 700 Milam, 10th Floor
> Houston, TX 77459

> Steven J. Fineman (#4025)
> Richards, Layton & Finger, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700
> fineman@rlf.com

# EXHIBIT A

EFiled: May 16 2008 12:06 PM EDT
Transaction ID 19862665
Case No. 08C-05-120 JEB

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| E. I. DU PONT DE NEMOURS<br>AND COMPANY, a Delaware<br>corporation,<br><br>Plaintiff,<br><br>v.<br><br>EQUITY MANAGEMENT, INC.<br>4365 Executive Drive, Suite 1000<br>San Diego, CA 92121<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No.<br><br>JURY TRIAL OF 12 DEMANDED |

## COMPLAINT

1.      Plaintiff is E. I. du Pont de Nemours and Company ("DuPont"), a Delaware

corporation.

2.      DuPont and Equity Management, Inc. ("EMI") entered into a contract, a copy of

which is attached as Exhibit A ("the EMI contract").

3.      The parties agreed that any action arising out of the EMI contract was made and

shall be governed by and construed in accordance with the laws of the State of Delaware. EMI

has conducted business in the State of Delaware.

4.      Pursuant to the EMI contract ,under which ,inter alia,  EMI agreed to find

prospective licensees to license DuPont trademarks for use on licensees' products, DuPont

entered into a trademark license agreement with ThorWorks Industries, Inc. a/k/a Sealmaster

Industries, Inc. ("ThorWorks"), a Minnesota corporation ("the ThorWorks License"), a copy of

which is attached as Exhibit B.

5.      The ThorWorks license permitted ThorWorks to use the DuPont trademarks on certain of ThorWorks products, one of which was driveway sealant.

<u>COUNT I</u>

6.      On July 13, 2005, Dale Martin ("Martin") filed a Complaint against 11 defendants, including DuPont alleging that he developed acute myelogenous leukemia as a result of exposure during his employment and in non-occupational endeavors to benzene or benzene-containing products, including the ThorWorks driveway sealant bearing the DuPont trademark pursuant to the ThorWorks License ("the Martin action").

7.      Subsequently, DuPont filed an answer to Plaintiffs Third Amended Complaint in the Martin action.

8.      After Plaintiff filed three amended complaints and following extensive discovery, Martin agreed to dismiss without prejudice and without consideration his claim against DuPont in the Martin action.   See Exhibit C, a copy of Order [of Dismissal] entered October 4, 2007.

9.      By the terms of the ThorWorks License, ThorWorks agreed to indemnify, defend, and hold DuPont and EMI, and their officers, shareholders, employees, and agents,

> harmless from and against any and all claims, suits, obligations, causes of action, liabilities, costs, and damages (including without limitation reasonable attorney's fees and court costs, injuries to persons and damages to property, products liability claims, and claims for environmental harms) based upon, arising out of, or directly or indirectly related to, the operations or business conducted by ... [ThorWorks] under this or related to this Agreement (including without limitation the design, testing, manufacture, sale, distribution, marketing, use, display, advertising, or promotion of Products sold or promoted in connection with any of the Trademarks) ....

See Exhibit A, Section 11. These indemnity provisions are applicable to the claims asserted by Mr. Martin against DuPont in the Martin action.

2

10.     DuPont tendered the defense of, and requested indemnity for, the Martin claim on or about October 29, 2006, to ThorWorks. See Exhibit D, copy of the demand letter attached hereto.

11.     In breach of its contractual obligations, ThorWorks has refused to defend or indemnify DuPont for the Martin action.

12.     As a result of the breach of contract by ThorWorks, DuPont has incurred damages in an amount exceeding $116,600.00, and should be reimbursed that amount by ThorWorks.

13.     On March 26, 2008, DuPont instituted a civil action in this court against ThorWorks that bears C.A. No. 08C-03-159 PLA ("the Delaware action") to recoup DuPont's costs to defend the Martin action. A copy of that Complaint is attached as Exhibit E

COUNT II

14.     On April 14, 2008, ThorWorks initiated an action in the U.S. District Court for the Northern District of Ohio, Western Division ("the Ohio action"), in which DuPont and EMI are named as defendants. A copy of the Complaint is attached as Exhibit F.

15.     On May 7, 2008, EMI requested that DuPont indemnify and defend it in the Ohio action.

16.     Contrary to the allegations and demand of EMI, DuPont does not owe a defense or indemnity to EMI in the Ohio action.  Rather, EMI owes DuPont a defense and indemnification in the Ohio action pursuant to the terms of the EMI contract under which EMI agrees to indemnify DuPont.

COUNT III

17.     DuPont repeats the allegations of paragraphs 1 through 16 as if set out in full.

3

18.     Based on the allegations in the Ohio action, EMI has breached its contract with DuPont, is no longer entitled to royalties arising from the ThorWorks products, and DuPont is entitled to recover any such royalties already paid EMI.

## COUNT IV

19.     DuPont repeats the allegations of paragraphs 1 through 18 as if set out in full.

20.     DuPont made inadvertent royalty payments to EMI, to which EMI was not entitled, in the amount of $272,323.75. None of these inadvertent payments involved Thorworks royalties ("Non-ThorWorks royalties").

21.     DuPont is entitled to a set-off of such amounts against any future royalty obligations under the EMI contract , and a return of any amounts remaining outstanding which were inadvertently paid by DuPont to EMI.

WHEREFORE, DuPont prays as follows:

(a)     that the Court declare that DuPont does not owe a defense or indemnity to EMI in the Ohio action, or in a similar action filed elsewhere.

(b)     that the Court declare that EMI does owe a defense or indemnity to DuPont in the Ohio action, or in a similar action filed elsewhere.

(c)     that the Court declare that EMI reimburse DuPont for the amounts paid to EMI in royalties for the ThorWorks products.

(d)     that the Court declare that EMI reimburse DuPont $272,323.75, the amount inadvertently paid to EMI in Non–ThorWorks royalties under the EMI contract.

(e)     that the Court declare that DuPont is entitled to a set-off $272,323.75 against any future royalty payments due EMI under the EMI contract.

4

(f)      for its costs, and pre-judgment interest on any amount that is entered as a

judgment in this action.

(g)      such other relief as the Court deems just and proper.

MORRIS JAMES LLP

_James W. Semple (#0396)_
David J. Soldo (#4309)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800
Attorneys for Plaintiff

OF COUNSEL:
Andrew C. Schirrmeister III
SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP
Pennzoil Place-North Tower
700 Milam, 10th Floor
Houston, Texas 77459


Dated:  May 16, 2008

5

EFiled: May 16 2008 12:06PM EDT
Transaction ID 19862665
Case No. 08C-05-120 JEB

# EXHIBIT A

Contract #   300494

Date:   August 25, 2005

Records Management Center
ITSU CRIM - Vital Records
Chestnut Run 708/191

## REPRESENTATION AGREEMENT

PARTY (IES)/ADDRES/S:              Equity Management Inc

SUBJECT MATTER:                   Appointing EMI To Negotiate Terms And
                                  Conditions For License Agreements With
                                  Respect To Intellectual Property And To
                                  Administer And Manage The  Relationships To
                                  Such Licenses
                                  Territory United States

EFFECTIVE DATE:                   June 15, 2001

EXPIRATION DATE:                  June 14, 2006

DESTRUCTION DATE:                 Evergreen Indemnity

RESPONSIBLE LEGAL PERSON:         V. H. Leichliter

SBU:                              Corporate Demand

LRAT Vital Sheet (LVS-01)
Confidential
Rev 06/04



## EMI REPRESENTATION

## AGREEMENT

This AGREEMENT between E. I. du Pont de Nemours and Company having its principal place of business at 1007 Market Street, Wilmington, Delaware 19898 ("DuPont") and Equity Management Inc. having its principal place of business at 4365 Executive Drive, Suite 1000, San Diego, California 92121 ("EMI") is made effective, and entered into as of this fifteenth (15th) day of June, 2001.

1. **DEFINITIONS:**

    (a)    **"Affiliate"** means:  (1) any corporation owning or directly or indirectly controlling at least fifty percent (50%) of the stock normally entitled to vote for election of directors of a party; and (2) any corporation owned or directly or indirectly controlled by a party, or by a corporation defined by item (1) of this sentence, through ownership of at least fifty percent (50%) of stock normally entitled to vote for election of directors.

    (b)    **"Cause"** is defined in item 8(e) of this Agreement.

    (c)    **"Compensation Percentage"** is defined in item 4(b) of this Agreement.

    (d)    **"Continuing Compensation"** is defined in item 4(a) of this Agreement.

    (e)    **"Effective Date"** means June 15, 2001.

    (f)    **"Extraordinary Termination"** is defined in item 3(b) of this Agreement.

    (g)    **"Gross Revenues"** means all monies paid by Licensees to EMI or DuPont, as the case may be, with respect to rights to use the Intellectual Property under License Agreements.

    (h)    **"Group I Licensees"** mean Licensees who purchased (or contracted to purchase) any product or service from DuPont (or have been contacted by DuPont regarding purchasing) any product or service from DuPont at any time during the twenty-four (24) month period prior to being contacted by EMI regarding licensing any Intellectual Property hereunder.

    (i)    **"Group II Licensees"** mean all Licensees that are not Group I Licensees.

    (j)    **"Intellectual Property"** means the trademarks, service marks, trade names, service names and related trade dress of DuPont, and/or its Affiliates, as set forth in the attached Exhibit A, and excludes patents and technical information.

(k)   "License Agreement" means those agreements licensing Intellectual Property that are executed by DuPont and any Licensee by virtue of EMI's efforts under this Agreement.

(l)   "Licensing Plan" means the written, strategic plan of action, requested by DuPont and prepared by EMI, identifying goals and objectives, time frames for action, and overall direction for the licensing program. It shall be reviewed by both DuPont and EMI, and approved by DuPont, to guide EMI's actions under this Agreement.

(m)   "Licensed Product" means those products or services of Licensees that are authorized to be advertised, promoted, used, and sold with the Intellectual Property.

(n)   "Licensee" means any party that enters into a License Agreement with DuPont by virtue of EMI's efforts under this Agreement (as such License Agreement may be renewed, reinstated, extended, or amended).

(o)   "Marketing Benefits" are defined in Exhibit C.

(p)   "Net Revenues" means Gross Revenues less amounts due EMI under this Agreement.

(q)   "Primary Branding" is defined in Exhibit A, Section 1.B.

(r)   "Quarter" means a calendar Quarter beginning on January 1, April 1, July 1, and October 1 of each calendar year during the Term.

(s)   "Term" is defined in item 3(a) of this Agreement.

(t)   "United States" means the United States of America and its territories, possessions, and military bases.

2.   **APPOINTMENT AND EMI RESPONSIBILITIES**

(a)   DuPont hereby appoints EMI, and EMI accepts such appointment, as:

(1) DuPont's exclusive representative to negotiate the terms and conditions for License Agreements with respect to United States Exhibit A Section 1 Intellectual Property; to administer such licenses; and to manage the relationships with respect to such licenses;

(2) DuPont's non-exclusive representative to negotiate the terms and conditions for United States Section 2 Intellectual Property; to administer such licenses; and to manage the relationships with respect to such licenses.

-2-

(b)   All proposed License Agreements negotiated by EMI hereunder shall be tendered to DuPont by EMI. DuPont, in its sole and absolute discretion, will have the option to decide whether or not to execute any such License Agreement tendered by EMI, and EMI shall have no power, right, or authority to bind or obligate DuPont to any of the terms and conditions of such License Agreements.

(c)   EMI will use its best efforts to provide its full and complete licensing expertise to DuPont and will provide sufficient experienced staffing so that its obligations herein will be fulfilled.  Services to be provided include, but are not limited to:

1)   providing strategic planning to define the mutual objectives, strategies, tactics and operating procedures covered by the annual Licensing Plan;

2)   arranging for the execution of License Agreements;

3)   providing status reports and periodic updates, at least each calendar Quarter, as appropriate and necessary;

4)   developing License Agreements through efforts of the EMI Sales Department;

5)   providing assistance to execute License Agreements;

6)   providing legal services through EMI's Legal Department for addressing the licensing process and other matters related to the Intellectual Property, including assistance in negotiating, drafting, and executing License Agreements;

7)   collecting royalties and making disbursements;

8)   managing relationships with Licensees;

9)   if requested and approved by DuPont, arranging for original research to further define the equity of the Intellectual Property and its licensing potential;

10)   reviewing labels, packaging, advertising, etc., prior to referring these items to DuPont for a final review;

11)   obtaining proof of use of the Intellectual Property by Licensees so that trademark registrations for the Intellectual Property can be procured, maintained, and protected;

12)   addressing misuse and infringement problems regarding the Intellectual Property, as authorized by DuPont; and

- 3 -

13)    Exercising due diligence to represent DuPont and its Intellectual Property in accordance with information, guidance and/or instructions provided by DuPont and in accordance with its obligations herein.

3.    **TERM/RENEWAL**

(a)    <u>Term</u>. This Agreement shall be effective as of June 15, 2001, and unless earlier termed as provided herein, shall continue in force thereafter for a term of five (5) years, i.e., through June 14, 2006 ("Term").

(b)    <u>Extraordinary Circumstances Requiring Early Termination</u>. In the event DuPont, in good faith, believes that trademark licensing under this Agreement has resulted in significant, detrimental impact on any item of Intellectual Property, and DuPont is able to provide demonstrable, tangible evidence of such impact, DuPont shall have the right to terminate such item of Intellectual Property from this Agreement upon 90-days prior, written notice ("Extraordinary Termination").

(c)    <u>Annual Review</u>. The parties shall meet or confer annually to review the progress of licensing hereunder. If at the second annual review, or any annual review thereafter, DuPont is not satisfied with the progress of licensing under any item of Exhibit A Section I Intellectual Property, then upon thirty (30) days prior written notice, DuPont shall have the right to convert such item to an Exhibit A Section II Intellectual Property.

4.    **COMPENSATION**

(a)    Except as otherwise provided herein, as compensation for its services hereunder with respect to Group I Licensees, EMI shall receive twenty-five percent (25%) of Gross Revenues arising from Group I Licensees.

(b)    Except as otherwise provided herein, EMI shall receive the following compensation for its services hereunder with respect to Group II Licensees:

| Annual Amount of Aggregate Combined Gross Revenues from Group I and Group II Licensees | EMI's Compensation for Group II Licensees will be the Following Applicable Percent of Group II Gross Revenues ("Compensation Percentage") |
|---|---|
| First $1 million | 35.0% |
| Second $1 million | 32.5% |
| Third $1 million | 30.0% |
| Fourth $1 million | 27.5% |
| All amounts over $5MM | 25.0% |

- 4 -

(c) EMI's compensation set forth in item 4(a) and 4(b) above is payable Quarterly, by deducting such amount from the segregated account maintained under item 5(b) below, or if sufficient funds are not available thereunder, obtaining such amount from DuPont within thirty (30) days after receipt of a monthly invoice.

5. EXPENSE

(a) Out-of-Pocket Expenses. To promote the Licensing Plan, the licensing program and other purposes of this Agreement, EMI shall be reimbursed at net cost, without any markup, for reasonable, out-of-pocket expenses incurred during the Term for the development, administration, marketing, and management of the licensing program, such as (but not limited to) travel and air express charges. Unless DuPont agrees to additional expenditures, expenses under this Section 5(a) shall not exceed the amounts set forth in Exhibit A, Section 3. Expenditures hereunder shall conform to DuPont's written travel guidelines as provided to EMI. Expenses reimbursable under this section shall not include EMI's salary costs, overhead costs, or EMI's routine or ordinary office expenses such as phone costs, rent, electricity, heating, and office supplies.

(b) EMI shall be reimbursed at the end of each month, during the Term of this Agreement, by deducting the amount of such permitted out-of-pocket expenses from the segregated account maintained for the DuPont account. Verification and documentation will be provided to DuPont. No deductions may be made unless they are for permitted out-of-pocket expenses or otherwise have DuPont's prior approval. In the event funds in such segregated account in any month are insufficient to cover such expenses, EMI shall invoice DuPont (net 45 days) for the balance due for such expenses for such month.

(c) Special Expenses. There may be certain additional special expenses not covered by Item 5(a) above which are reasonably necessary and prudent to develop License Agreements hereunder and which EMI may suggest be incurred and paid by DuPont. Examples include, but are not limited to, development and production of licensing sales materials and brochures, special research and related materials, graphics, artwork, printing, market research, purchases of special materials and publications for the licensing program. DuPont shall have sole discretion to elect whether or not to approve such special expenses. EMI will submit written estimates for such special expenses for DuPont's prior express written approval. If so approved, EMI shall be reimbursed for such expenses incurred, at net cost, in the same manner as provided in item 5(a) above.

6. REPORTS, PAYMENTS, AND RECORDS

(a) Reports and Records. Within thirty (30) days after the end of each Quarter, with respect to each License Agreement, EMI shall report to DuPont relevant financial information including, but not limited to, Licensed Product sales, applicable royalty rates, Gross Revenues, and Net Revenues in a format substantially similar to Exhibit C hereto. EMI shall maintain accurate and up-to-date books and

- 5 -

records with respect to its licensing activities hereunder, including each License Agreement that it administers and/or manages. Not exceeding once per calendar year, DuPont shall have the right to conduct an audit during normal business hours, at its own expense, and with at least five days' prior written notice, to determine EMI's compliance with the terms and conditions hereof. DuPont's audit rights shall continue until three (3) years after the expiration or termination of this Agreement. EMI shall keep all pertinent books and records for one (1) year after DuPont's audit rights have expired.

(b)   Reconciliation and Payments to DuPont. Promptly after the end of each Quarter, EMI shall conduct a Quarterly reconciliation and remit to DuPont within thirty (30) days of the end of each Quarter all Net Revenues. After receipt of any Gross Revenues, EMI shall promptly deposit them into one or more interest-bearing accounts at federally insured banks or financial institutions; such accounts shall be in the form of segregated accounts maintained by EMI for the benefit of the parties hereto. The interest earned on DuPont's share of royalties shall be owned by DuPont, and the interest earned on EMI's share of royalties shall be owned by EMI. All payments to DuPont under this Item 6 shall be accompanied by a complete statement of account in the format attached as Exhibit C hereto.

7.   DUPONT RESPONSIBILITIES

(a)   DuPont will assist and support EMI in developing License Agreements hereunder, to the extent reasonable and appropriate, by providing appropriate marketing strategy and background information; providing input regarding art work; developing and reviewing sales brochures; providing guidance regarding developing the Licensing Plan(s); and reviewing Licensees, Licensed Products, the Licensing Plan(s), and License Agreements.

(b)   DuPont will make reasonable efforts to refer all third-party inquiries regarding licensing the Exhibit A, Section 1, Intellectual Property to EMI. As DuPont deems necessary or appropriately, in its sole judgment, DuPont will take reasonable steps to protect the Intellectual Property, such as, for example, procuring and maintaining trademark registrations and addressing misuse and infringement problems that cannot be resolved by EMI under item 2(d)(12) above, or that DuPont elects to handle on its own.

(c)   From time to time during the Term of this Agreement, DuPont will consider: (1) additional product categories for which EMI is permitted to develop License Agreements as contemplated under this Agreement, and (2) the expansion of License Agreements beyond the United States. At DuPont's sole and absolute discretion, additional product categories and/or countries may be made subject to this Agreement, and if so, a written amendment to this Agreement will be executed.

(d)   EMI's Presence at Management Meetings. Due to the importance of DuPont management's involvement in decisions regarding the usage of the Intellectual Property, DuPont will provide appropriate forums for EMI to present the

- 6 -

Licensing Plan(s) and proposed Licensees or product categories. Upon DuPont's invitation, EMI shall be permitted to attend meetings with appropriate DuPont management to address the Licensing Plan and matters related thereto.

(e)    EMI is under review for being a primary provider of trademark licensing services under DuPont's Legal Model Program ("PPTLS"). Provided EMI is awarded such status, then if EMI receives any new business which arises from a referral or recommendation by virtue of EMI being associated with the Legal Model Program or being a PPTLS, then all compensation arising from such new business shall be included in the Annual Amount of Aggregate Combined Gross Revenues from Group I and Group II licenses under item 4(b) above. EMI's being associated with the DuPont Legal Model and being a PPTLS is subject to the requirements of that Program.

8.    **TERMINATION**

(a)    <u>Continuing Compensation Upon Termination</u>. Upon expiration of this Agreement or termination by DuPont for any reason other than for Cause termination, as further addressed in Section 8(g) below, EMI shall be entitled to continue to receive the following shares of Gross Revenues from Licenses attributable to EMI services hereunder but only to the extent such Licenses are in force after such expiration or termination ("Continuing Compensation"):

(i)    For Group I Licensees: The Continuing Compensation shall be as set forth in item 4(a) above and shall terminate on the fifth (5th) anniversary of the date of expiration or termination of this Agreement, as the case may be.

(ii)    For Group II Licensees: The Continuing Compensation shall be as set forth in Item 4(b) above with the following adjustments, and shall terminate on the fifteenth (15th) anniversary of the date of expiration or termination of this Agreement, as the case may be:

| Period | Adjustment in the Compensation Percentage |
| --- | --- |
| First five years | None |
| Second five years | 5 percent reduction in the applicable Compensation Percentage provided, however, that such Compensation Percentage shall not be less than 25 percent |
| Third five years | The applicable Compensation Percentage shall be 25 percent. |

-7-

(b)     At DuPont's request, during any period of Continuing Compensation to EMI as provided in Item 8(a) and 8(b) above, EMI shall continue to provide DuPont with relationship management, royalty administration, and other necessary administrative services related to those Licensees continuing to pay royalties.

(c)     For Cause Termination by DuPont/Compensation. If this Agreement is terminated for Cause by DuPont for any reason, then EMI shall continue to receive its share of Gross Revenues until the date of such termination.

(d)     Manner of Payment/Audit Right. After expiration or termination of this Agreement, for reasons other than Cause, if DuPont elects not to make use of EMI's services as set forth in item 8(b) above, then Gross Revenues shall be collected by DuPont and any continuing royalty revenue owed EMI shall be paid by DuPont in the manner set forth in Section 8 (a) above within forty-five (45) days after the end of each Quarter, together with a report thereof in the form of Exhibit C.

(e)     EMI shall close the segregated account maintained hereunder promptly after termination or expiration of this Agreement. Within thirty (30) days after such termination or expiration, as the case may be, EMI shall remit to DuPont the Net Revenues and a statement of account. EMI shall have the right to obtain, upon reasonable prior written notice during normal business hours, information from DuPont's books and records pertaining to licensing revenues received by DuPont as may be reasonably necessary for EMI to verify its share of the revenues under this Section.

(f)     EMI shall be permitted to audit DuPont's pertinent financial records, no more than once per calendar year while the continued compensation to EMI under 8(a) above is due and for three (3) years thereafter. Any audit will take place during normal business hours upon five (5) days' prior written notice. All pertinent records shall be kept for at least one year after EMI's audit right has expired.

(g)     For Cause Termination. This Agreement may be terminated for Cause by either party in the event of a material breach by the other party, provided the terminating party gives ninety (90) days' prior written notice to the breaching party, and provided further that the breaching party fails to cure or satisfy the alleged breach substantially within the ninety (90) day period. If the alleged breach cannot reasonably be cured or satisfied substantially within said period, but the breaching party is continuously working in good faith to cure or satisfy the breach within said period, then with written notice to the non-breaching party, the breaching party shall be allowed reasonable additional time necessary to cure such breach.

(h)     Licensee Procurement. If:

(1)     During the Term of this Agreement and in the ordinary course of EMI providing the services as contemplated hereunder, EMI has begun negotiations with a named third party who has expressed a bona fide interest in licensing a product or service set forth in Exhibit A, but such

- 8 -

proposed licensing is rejected by DuPont or a License Agreement therefore is not executed for any reason ;

(2) Any negotiation covered by item 8(h)(1) above ended less than three (3) years before the expiration of this Agreement or termination of this Agreement for any reason other than Cause; and

(3) if within twenty-four (24) months after the expiration of this Agreement or termination of this Agreement for any reason other than for Cause, DuPont and the third party(ies) identified by EMI enter into a License Agreement, then EMI shall be entitled to one-half (1/2) of its share of compensation hereunder as provided in item 4(a) herein above for a period of five (5) years after such expiration or termination, as the case may be.

9.    **INDEPENDENT CONTRACTORS**

It is understood that the relationship between the parties shall be that of independent contractors, that neither party shall have any right or power to obligate, bind, or commit the other to any expense, liability, or matter other than as expressly provided and authorized in this Agreement, and that the officers, employees, servants, and agents or other representatives of the parties shall not be deemed expressly or impliedly the employees, servants, partners, joint ventures or agents of the other. Specifically, EMI and DuPont both understand that EMI has no authority to bind DuPont to any licensing commitments to any potential Licensees, and all such commitments are only binding after the express approval and authority granted by DuPont to such third party.

10.    **MISCELLANEOUS**

(a)    <u>Waiver</u>. No waiver of any breach, privilege, or provision hereunder shall be construed as a waiver of any future breach, privilege, or provision.

(b)    <u>Validity of Agreement</u>. In case any term of this Agreement shall be held invalid, illegal or unenforceable in whole or in part, neither the validity of the remaining part of such term nor the validity of any other terms shall be affected thereby.

(c)    <u>Choice of Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, except any such law directing the application of the laws of another jurisdiction.

(d)    <u>Prior Agreements and Amendments</u>. This Agreement supercedes and replaces all prior agreements and understandings between the parties regarding the specific subject matter hereto and, when signed, may be amended only by an express writing signed by both parties hereto.

(e)    <u>Indemnification</u>. DuPont will indemnify, defend, and hold EMI free and harmless from any and all third-party claims, obligations, losses, suits, demands, judgments, interest, penalties, fines, costs and expenses (including, but not limited to reasonable attorneys' fees and costs), damages, or liability of any kind that are

- 9 -

asserted against EMI to the extent arising out of or related to the Intellectual Property, DuPont products, and/or EMI's efforts directed by DuPont, including but not limited to claims of product liability, infringement, or other claims related to any License Agreement or proposed License Agreement under this Agreement involving the Intellectual Property; provided, however, this indemnity and "hold harmless" shall not apply to the extent any such claims, obligation, losses, suits, demands, or liability arise from EMI's uncured material breach of this Agreement; or any illegal, fraudulent, negligent, or willful conduct of EMI not directed by DuPont.

With respect to the defense of any claim or litigation to which the above indemnification provision applies. DuPont (at its own expense) shall have the right to select counsel of its own choice and direct and control the defense of the action and any settlement as it deems proper. EMI shall provide DuPont prompt written notice in the event of the receipt of knowledge of any claim or cause of action against EMI to which it believes this indemnity provision applies and shall cooperate with and provide reasonable assistance to DuPont in the defense of such claim or cause of action.

EMI will indemnify, defend, and hold DuPont free and harmless from any and all third-party claims, obligations, losses, suits, demands, judgments, interest, penalties, fines, costs and expenses (including, but not limited to reasonable attorneys' fees and costs), damages, or liability of any kind asserted against DuPont to the extent arising out of or related to the Intellectual Property, DuPont products, any License Agreement or any proposed License Agreement based upon, or arising from, EMI's uncured material breach of this Agreement; or any illegal, fraudulent, negligent, or willful conduct of EMI not directed by DuPont; provided, however, this indemnity and "hold harmless" shall not apply to the extent any such claims, obligations, losses, suits, demands, or liability arise from: DuPont's uncured material breach of this Agreement, or any illegal, fraudulent, negligent, or willful conduct of DuPont. Notwithstanding anything to the contrary herein, EMI's liability under this indemnity shall not exceed the limits of the insurance specified in item 10(m)(B) herein below.

With respect to the defense of any claim or litigation to which the above indemnification provision applies. EMI (at its own expense) shall have the right to select counsel of its own choice and direct and control the defense of the action and any settlement as it deems proper. DuPont shall provide EMI prompt written notice in the event of the receipt of knowledge of any claim or cause of action against DuPont to which it believes this indemnity provision applies and shall cooperate with and provide reasonable assistance to EMI in the defense of such claim or cause of action.

- 10 -

(f)    Notice.  All notices and statements to be given and all payments to be made
hereunder shall be given to or made at the respective addresses of the parties as
set forth below unless written notification of a change of address is given to the
other party, and the date of mailing shall be deemed the date the notice or
statement is given:

NOTICES:

DuPont:
E. I. du Pont de Nemours and Company
Marketing Communications Sourcing
Attn:  A. Elizabeth Davison
Lancaster Pike and Route 141, BMP-22-2266
Wilmington, DE  19805
Phone: 302-892-7117
Facsimile: 302-992-2111
E-mail: a-elizabeth.davison@usa.dupont.com
with copy to:
E. I. du Pont de Nemours and Company
Legal Department
Attn: David J. Gould
1007 Market Street, D-4058-1
Wilmington, DE 19898
E-mail:  david.j.gould@usa.dupont.com

EMI:
Equity Management Inc.
Attn:   Mr. Glen Konkle, President
4365 Executive Drive, Suite 1000
San Diego, CA 92121
E-mail: gkonkle@equitymanagementinc.com

PAYMENTS:

DuPont:
E. I. du Pont de Nemours and Company
Fluoroproducts SBU
Route 141 & Center Road
Attn: James V. Forte
P.O. Box 80702, CRP 702-1232D
Wilmington, DE 19880-0702
E-mail:  james.v.forte@usa.dupont.com
with copy to:
E. I. du Pont de Nemours and Company
External Affairs SBU
Attn: Scott F. Nelson
1007 Market Street, D-11050
Wilmington, DE 19898
E-mail: scott.f.nelson@usa.dupont.com

EMI:
Equity Management Inc.
Attn: Mr. Glen Konkle, President
4365 Executive Drive, Suite 1000
San Diego, CA 92121
E-mail: gkonkle@equitymanagementinc.com

– 11 –

(g)    Headings. The headings contained in this Agreement are for convenience only, and shall not be used to interpret or construe any substantive provisions hereof.

(h)    Force Majeure. If either party is prevented from performing any obligation hereunder by reason of an Act of God, insurrection, fire, explosion, strike, labor dispute, casualty accident, lack or failure of transportation facilities, failure of suppliers, or other third parties, flood, war, civil commotion, or any law, order or decree of any government or subdivision thereof, or any other cause beyond its reasonable control ("Force Majeure"), then such party shall be excused from performance hereunder to the extent and for the duration of such Force Majeure and such amount of time reasonably necessary to recover, provided the party notifies the other party of such prevention. In the event either party declares such Force Majeure, any performance criteria hereunder shall be adjusted accordingly to recognize the duration and scope of such Force Majeure.

(i)    Representations and Warranties. Each party represents and warrants that it has the ability and authority to enter into this Agreement, and all approvals and rights granted hereunder shall have gone through all necessary internal corporate or division level approval processes prior to being directed or granted to the other party; further, DuPont represents and warrants that: (i) while this Agreement is in effect, it shall not grant any representation rights which are in conflict with those granted to EMI under this Agreement; and (ii) DuPont has the requisite authority as of the Effective Date to license the Intellectual Property as contemplated hereunder.

(j)    Confidentiality. All information made available by one party to the other party will be on a "need-to-know" basis. This information, including but not limited to sales, revenue or expense data, marketing or merchandising plans, and marketing research studies, and certain other proprietary or confidential information made available to each party by the other (including, but not limited to, the form and terms of this Agreement and the proprietary analytical and research techniques and marketing research studies of EMI, shall be considered confidential to the disclosing party (hereafter referred to as "Confidential Information"). Neither party shall acquire any right or interest in the Confidential Information of the other.

All Confidential Information shall be maintained in the strictest confidence, and neither party shall use or disclose the Confidential Information of the other in any manner inconsistent with, or in violation of, this Agreement. Upon termination or expiration of this Agreement, except as otherwise required herein, all Confidential Information of a party in the possession of the other shall be returned to its owner, or at the owner's option, expense, and specific direction, be destroyed (per owner's request) with such destruction evidenced by sworn affidavit of the destroying party. These confidentiality duties and obligations shall survive any termination or expiration of this Agreement. These confidentiality duties and obligations shall not apply to any information which is specifically known to or in possession of the recipient at the time of disclosure, or which is or ever becomes public domain information other than through disclosure by the non-owning party to this

- 12 -

Agreement. All obligations of confidentiality hereunder shall expire twenty (20) years from the effective date hereof.

(k) Gifts and Favors.

(1) Gifts, favors, and entertainment may be given others, including potential Licensees, at EMI's expense only if they meet all the following criteria: (a) they are consistent with customary business practices; (b) they are not excessive in value and cannot be construed as a bribe or pay-off; (c) they are not in contravention of applicable law or ethical standards; and (d) public disclosure of the facts will not embarrass DuPont.

(2) Secret commissions or other compensation to employees of others, including potential Licensees (or their family members or associates), are contrary to DuPont policy. EMI hereby represents that, in its dealings on behalf of DuPont, no action inconsistent with this statement and policy will be taken directly or indirectly. EMI further acknowledges and agrees that any such action will serve as grounds for immediate termination of this Agreement by DuPont as per the provisions of Item 8(g) herein above.

(l) DuPont's Non-Solicitation of EMI Employees and Consultants. DuPont agrees that it shall not, during the Term (as renewed) and for a period of two (2) years after the termination or expiration of this Agreement, solicit nor hire any employee of, or consultant to, EMI (but only such employees or consultants who have been engaged by EMI to work on DuPont's Licensing Program). Not withstanding anything to the contrary herein, such restriction upon DuPont shall apply only to any employees and/or consultants of EMI during the employee(s)' and/or consultant(s)' relationship with EMI and for a period of six (6) months after the termination or expiration of the employee(s)' or consultant(s)' relationship with EMI.

(m) EMI shall maintain during the term of this Agreement the following types and levels of insurance: (A) Comprehensive General Liability Insurance with the minimum bodily injury and property damage limits of $5,000,000 each occurrence; (B) Errors and Omissions Insurance (claims made form) with minimum limits of $1,000,000 per claim and aggregate; and (C) Excess Liability Insurance Coverage applicable to the foregoing items (A) and (B) in the amount of $5,000,000. DuPont shall be named as an additional insured for the insurance covered in this item 10(m). Upon request, EMI shall furnish to Client, evidence of such insurance coverage in the form of a Certificate of Insurance indicating that premiums have been paid for the then current term. EMI shall not make any material change to this coverage without providing Client with notice.

- 13 -

**E. I. DU PONT DE NEMOURS AND COMPANY (DUPONT)**

_Authorized Signature_

_James V. Forte_
Typed Name

_Global Brand MGR - TEFLON_
Title

_Authorized Signature_

_Scott E. Nelson_
Typed Name

_Global DuPont Brand MGR._
Title

_Kathleen H Forte_
Authorized Signature

_Kathleen H. Forte_
Typed Name

_Vice President — Global Public Affairs_
Title

**EQUITY MANAGEMENT INC (EMI)**

_Glen A. Konkle_
Authorized Signature

_Glen A. Konkle_
Typed Name

_C.E.O._
Title

DJG:EMI:rtp
shared/goodddy/emi agreement
4/2/02

- 14 -

**EXHIBIT A**

Section 1:  Intellectual Property for which EMI has Exclusive Licensing Rights:

    A.  The TEFLON® trademark and the TEFLON® logo for the following products:

- Automotive waxes and appearance products for the "do-it-yourself" market. (This category excludes any such waxes and appearance products used at car washes, professional details, or auto dealerships.)
- Automotive oil filters
- Lubricants (excluding additives for automotive and marine engine oil)
- Automotive wiper blades
- Razor blades
- Plumber's tape and sealants
- OEM and after-market automotive wheels that have been painted with clear-coat finishes
- Automotive, motorcycle, and bicycle and shock absorbers

    B.  The DUPONT OVAL logo, DUPONT™, and/or THE MIRACLES OF SCIENCE® trademarks for Primary Branding for any products that are mutually agreed to be added to this Exhibit A, Section 1.B during the term of this Agreement.  By Primary Branding is meant that the DUPONT OVAL logo, DUPONT™, and/or the THE MIRACLES OF SCIENCE® trademarks will appear as the primary brand(s) on the licensed product. Any licensing or rights exercised or granted in accordance with this Exhibit A, Section 1.B., does not preclude DuPont from using or licensing the DUPONT OVAL logo, the DUPONT™ trademark, and/or THE MIRACLES OF SCIENCE™ trademark: (1) in association with any ingredient trademark of DuPont or any of its Affiliates, or (2) for any product, use or country not covered by this Exhibit A, Section 1.B.

Section 2:  Intellectual Property for which EMI has Non-Exclusive Licensing Rights

    A.  TEFLON® trademark and the TEFLON® logo for the following products and the products of the following companies:

- Verbatim—computer floppy diskettes in 3 ½" and 5 ¼" sizes
- Lithonia—industrial lighting
- Nail enamel products
- Electric shavers
- Polymer-based grouts and sealants for stone and other porous mineral surfaces
- Toothbrushes
- Hardware items (e.g., hinges and slides)
- Manual and power hand tools

- i -

Exhibit A (continued)

B. The DUPONT OVAL logo, DUPONT™, and/or THE MIRACLES OF SCIENCE® trademarks for the following products:

- Automotive products — appearance, additives, touch-up paints, accessories, motor oil, antifreeze, batteries, car mats
- Boat products
- Light bulbs — new long-life, energy efficient; shatter resistant and thread coatings
- Building material products — caulks, fillers, adhesives, lubricants, driveway coatings
- Paint application tools — brushes, rollers, pads, sprayers
- Science education offering — (e.g. offering to Sylvan)
- Science (in place of chemistry) sets
- Safety products — home, sports, garden and home maintenance
- Pharmaceutical — OTC, testing/monitoring devices, vitamins
- Kitchen/food and home storage "plastics" (e.g. products similar to those sold under the Gladware® brand and products similar to those made by Rubbermaid.)
- Office and school supplies — markers, inks, adhesives, computer paper, etc.
- Luggage — can include sports bags and backpacks
- Oral hygiene — toothbrushes, dental floss…
- Camping

Section 3: Annual Budgets for Out-of-Pocket Expenses:

- For the TEFLON® trademark $40,000
- For the DUPONT OVAL logo, DUPONT™, and THE MIRACLES OF SCIENCE® trademarks combined. $40,000

**EXHIBIT B**

**LICENSING PROGRAM MANAGEMENT FOR
DU PONT LICENSING PROGRAM
ANNUAL REVIEW**

Annually, for each product category of Intellectual Property, EMI will meet with DuPont to discuss the following:

A.  Review of all existing Licensees

    1)  Review of financial performance and ROI for each Licensee, including review of financial performance objectives and the establishment of future objectives;

    2)  Review of marketing benefits for each Licensee, including review of marketing benefits objectives and the establishment of future objectives.

    3)  "Marketing Benefits" shall be determined as follows and reported to DuPont by EMI annually:

        a)  Advertising, promotion and marketing expenditures by Licensees; and

        b)  Product impressions, valued by multiplying the total number of units of Licensed Product sold times the average of ten (10) impressions per unit times the value of $0.05 per impression.

B.  Evaluation of current categories

C.  Consideration of new categories

D.  Review of customer satisfaction, using EMI's Annual Review of Customer Service as a discussion tool.

-i-

**EXHIBIT C**

**REPORT FORMAT**

FOR QUARTER FROM _____ TO _____ 2002

LICENSEE _____

# EXHIBIT B



David J. Gould
Corporate Counsel
DuPont Legal
4417 Lancaster Pike
BMP–25–2210
Wilmington, DE 19805
U.S.A.
Phone: 302-992-5020
Facsimile: 302-892-0562
Home Page: http://www.dupont.com
E-Mail: david.j.gould@usa.dupont.com

September 14, 2004

ThorWorks Industries, Inc.
P.O. Box 2277
2520 South Campbell Street
Sandusky, OH 44870

Dear Sir or Madam:

<u>Change of Corporate Name</u>

Reference is made to the DuPont™ Brand Trademark License Agreement ("Agreement") between E. I. du Pont de Nemours and Company ("DuPont") and Sealmaster Industries, Inc. ("Sealmaster") effective May 17, 2004.

As described in (1) the letter of August 9, 2004, from Rick Noon of Sealmaster to David J. Gould and Kim Clark of DuPont, and (2) the letter of July 8, 2004, from Rider Bennett (Sealmaster's counsel), the name of Sealmaster has been changed to ThorWorks Industries, Inc.

Accordingly, it is hereby proposed that all references in the Agreement to Sealmaster and Sealmaster Industries, Inc., are replaced respectively with ThorWorks and ThorWorks Industries, Inc., as the case may be.

If you agree to the above, then please sign both copies hereof and return to me.

Very truly yours,

E. I. du Pont de Nemours and Company

By *David J Gould*
Printed Name: David J. Gould

Accepted and agreed:

ThorWorks Industries, Inc.
By
Printed Name: David Thorson
Title: President

REC'D
SEP 2 0 2004
TRADEMARKS

DJG:rrp

DUPONT™ BRAND
TRADEMARK LICENSE AGREEMENT

THIS AGREEMENT made this 17 ᵀᴴ day of May , 2004, ("Effective Date") between E. I. DU PONT DE NEMOURS AND COMPANY, a corporation of the State of Delaware, U.S.A., with its principal place of business at 1007 Market Street, Wilmington, Delaware 19898, U.S.A. ("DUPONT"), and SEALMASTER INDUSTRIES, INC., a corporation organized and existing under the laws of the State of Minnesota U.S.A., with its principal place of business at 2520 South Campbell Street, Sandusky, Ohio 44870 ("LICENSEE").

WITNESSETH;

WHEREAS, DUPONT is the owner of the DuPont™ Brand Trademarks set forth in Exhibit A, (hereinafter referred to as "Trademarks").

WHEREAS, LICENSEE desires a license under the Trademarks, and DUPONT is willing to grant the same upon the terms and conditions hereinafter recited; and

WHEREAS, EQUITY MANAGEMENT, INC., ("EMI") is the exclusive licensing agent for DUPONT for certain matters regarding this Agreement.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties herein, DUPONT and LICENSEE agree as follows:

1.   GRANTS:  DUPONT hereby grants to LICENSEE a nontransferable, nonassignable, revocable, exclusive right, without the right to sublicense, to use the Trademarks, solely and only in the Territory, Field of Use, and Distribution Channels set forth in Exhibit A, on and in connection with the display, advertising, promotion, labeling, sale, marketing, and distribution of Products set forth in Exhibit A. Notwithstanding anything to the contrary herein, the license granted herein is subject to the right of DUPONT to use the DuPont™ Brand Trademarks to identify ingredients in Products and other products.

   a)   <u>Limited License:</u>  Nothing in this Agreement shall be construed to grant LICENSEE any rights or license to any trademark, trade name, certification mark, service mark, domain name, product name, logo, patent, technical information, or copyright of DUPONT other than as specified herein. All rights not specifically granted to LICENSEE are reserved to DUPONT.

   <u>Use:</u>  DUPONT reserves the right as owner of the Trademark to specify all aspects of use of the Trademark, including but not limited to, the manner, place, type, form, layout, design, channels of trade, channels of distribution, and media of or for such use, on or in connection with, all displays, advertising, labels, Products literature, Internet sites, sales promotion materials, and all other forms of use of the Trademarks. All use of the licensed Trademarks shall inure to the benefit of DUPONT. LICENSEE shall comply with any specific trademark use rules as may be referenced in any of the Exhibits, or provided to LICENSEE, which may be amended or revised by DUPONT from time to time, upon written notice.

   Except as expressly permitted herein or except in accordance with DUPONT's prior written approval, no other trademarks, trade names, corporate names, certification marks, service marks, product names, logos, brands, domain names or identifiers are permitted to be used with the Products.

b) **Acknowledgment:** LICENSEE hereby acknowledges the validity of DUPONT's Trademarks and DUPONT's exclusive right, title and interest in and to the Trademarks. LICENSEE shall not, during the term of this Agreement, or thereafter: 1) do or permit to be done any act or thing which prejudices, infringes or impairs the rights of DUPONT with respect to the Trademarks; 2) except for the limited license granted hereunder, will never represent that it has any right, title, or interest in or to the Trademarks or in any registration for them; 3) shall not use, register or attempt to register any Trademarks, trade names, logos, domain names, electronic mail (e-mail) addresses, or server names that are identical to, or confusingly similar to the Trademarks or any other Trademarks, trade names or domain names of DUPONT or any of its subsidiaries or affiliated companies; 4) shall not do anything or produce any goods in connection with the Trademarks that damages or reflects adversely upon DUPONT, its subsidiaries or affiliated companies or any of their Trademarks, trade names or domain names; 5) upon objection by DUPONT, shall forthwith desist from any use or action in relation to or in connection with the Trademarks or this Agreement that do not meet reasonable trademark use or licensing practices or standards, do not meet DUPONT's then current Trademark Use Rules (Exhibit B) or Identity Standards, or do not comply with previously approved Copy (see Section 6); and 6) when requested by DUPONT, shall employ identifying symbols and/or words in connection with its use of the Trademarks. LICENSEE shall cooperate with DUPONT in taking all appropriate measures for the protection of the Trademarks, and shall faithfully observe and execute the requirements, procedures, and directions of DUPONT with respect to the use and protection of the Trademarks.

c) **Goodwill:** LICENSEE recognizes the value of the reputation and goodwill associated with the Trademarks, acknowledges that the Trademarks and any marks confusingly similar to the Trademarks have acquired secondary meaning, and that all related rights and goodwill belong exclusively to DUPONT.

d) **Art Work:** All art, design, and layout work (hereinafter, collectively, "Art Work") that contains, is derived from, or used with the Trademarks, but excluding the Trademarks per se, will be owned by the party developing it. LICENSEE shall not obtain, attempt to obtain, or claim any trademark or copyright rights with respect to any Trademarks included in the Art Work, and upon request, LICENSEE shall assign copyright rights in or to the Trademarks to DUPONT.

e) **Notification of Infringement:** LICENSEE shall notify DUPONT in writing of any manufacture, distribution, sale or advertisement of any product or service that may constitute an infringement upon DUPONT's rights or LICENSEE's authorized use of the Trademarks. LICENSEE shall not commence, prosecute or institute any action or proceeding against any person, firm, or entity alleging infringement, imitation, or unauthorized use of the Trademarks.

f) **Infringement Action:** DUPONT shall have the sole right to determine the appropriate action to be taken with respect to any infringement, imitation, or unauthorized use of the Trademarks including having the sole discretion to settle any claims or any controversy arising therefrom. LICENSEE shall provide DUPONT with such reasonable assistance as DUPONT may require in obtaining any protection of DUPONT's rights to the Trademarks at no expense to DUPONT. LICENSEE shall not have any rights or claim against DUPONT for damages or otherwise arising from any determination by DUPONT to act or not to act with respect to any alleged infringement, imitation or unauthorized use by others, and any such determination by DUPONT shall not affect the validity or enforceability of this Agreement. Any and all damages and settlements recovered arising from any action or proceeding shall belong solely and exclusively to DUPONT.

g) **Assignment to DUPONT:** Upon request, LICENSEE shall transfer to DUPONT any rights which accrue to LICENSEE arising from its use of the Trademarks or this Agreement.

2. ROYALTY: Any applicable royalties hereunder are set forth in Exhibit A.

3. QUALITY STANDARDS, INSPECTION, AND TESTING: So that the value of the goodwill and reputation associated with the Trademarks will not be diminished, LICENSEE will ensure that all Products sold using the Trademarks are manufactured in compliance with and meet all applicable governmental and industry laws, rules, regulations, standards, guidelines, and the like, including but not limited to, those related to fitness of use and safety for human use, and these established by the Environmental Protection Agency, the National Science Foundation, and Underwriter's Laboratories. LICENSEE shall also manufacture the Products in accordance with LICENSEE's Quality Standard (ISO9002) as approved by DUPONT. The Products will be equal to and preferably superior to, the quality that a consumer would reasonably expect of products and are similar in type, nature, and price.

To monitor for LICENSEE's adherence to such obligations, DUPONT shall have the right, from time to time through duly authorized representatives, to inspect and test such Products at DUPONT's own expense. Licensed Products not meeting the quality or other requirements of this Agreement shall not be sold or in any way promoted in connection with the Trademarks, and all references to the Trademarks on labels, product literature, packaging, hang tags, promotional material, etc., shall be removed or obliterated at LICENSEE'S expense.

LICENSEE shall be responsible for ensuring that any manufacturer of Products and ingredients therefore, for or on behalf of the LICENSEE, shall meet the quality and other requirements of this Agreement.

If at any time LICENSEE desires to upgrade, modify, supplement, or change any aspect of the Products or the quality standards for the Products (hereinafter, collectively, "Proposed Changed Products"), LICENSEE will submit notice of the Proposed Changed Products to DUPONT with at least thirty (30) days advance written notice and concurrent oral notice. Within thirty (30) days of the receipt of notice of any Proposed Changed Product, DUPONT will notify LICENSEE of DUPONT's decision regarding such Proposed Changed Products. All Proposed Changed Products must be approved by DUPONT in writing before release; such approval may be granted or withheld in DUPONT's sole discretion. If DUPONT rejects any Proposed Changed Products, thereafter, if the parties mutually desire, they will confer to attempt to reach agreement regarding an acceptable Proposed Changed Products, provided, however, that DUPONT will have sole discretion regarding whether or not to reject or accept any such Proposed Changed Products. Notwithstanding anything to the contrary herein, if DUPONT does not approve within 30 days, it shall be deemed not approved.

Before selling or distributing any initial Products or accepted Proposed Changed Products, LICENSEE shall furnish DUPONT and EMI, at no charge, for its use, six (6) samples of Products from the first production run. If such samples do not conform to all aspects of the Products as required herein, then DUPONT shall notify LICENSEE and all such Products shall be deemed to be disapproved, and all such Products shall be promptly disposed of as required herein above in this Section 3. LICENSEE shall also furnish DUPONT, free of charge, with any additional samples of Products as may reasonably be required by DUPONT to promote the sale of Products (e.g., advertisements, publicity photos, product placement and trade shows) or for comparison with earlier samples.

4. OTHER REQUIREMENTS:

   a) Unless otherwise agreed in writing by DUPONT, the Trademarks will be used as the primary brands for the Products.

3

b) Competitive product will not be used in any Products that would be detrimental to DUPONT.

c) Products will bear the following notice: "Manufactured and Distributed By:  In case of questions, problems, or emergencies, please contact [INSERT COMPANY NAME, 800 PHONE NUMBER, AND E-MAIL ADDRESS], who assumes liability for the manufacture for this Product.

5.  PRODUCT STEWARDSHIP:

a) Prior to the shipment of Product and before any product is sold bearing the Trademarks, LICENSEE shall provide information to DUPONT to assist DUPONT in determining that LICENSEE has adequate systems in place to exercise appropriate product stewardship for all Products so as to assure that the Products will be reasonably safe for users and handlers and for the environment.  LICENSEE shall provide information to demonstrate that its product stewardship systems fulfill all of the principles of Industry Product Stewardship as set forth in Exhibit C to this Agreement. [Product Stewardship Responsible Care® Code of Management Practices].

b) LICENSEE shall cooperate with DUPONT's review of LICENSEE's product stewardship systems for Products bearing the Trademarks, including, but not limited to the following requirements:

(1)    At any time prior to or after execution of the Agreement, LICENSEE shall provide accurate and complete information requested by DUPONT that is deemed necessary to determine LICENSEE's conformance to the standards set forth in Exhibit C.  Such information shall include, but shall not necessarily be limited to, all applicable information requested in DUPONT's Protocol for Assessing the Stewardship Systems of Potential Licensees of the Trademarks, attached hereto as Exhibit D; and

(2)    LICENSEE shall have an affirmative responsibility to notify and provide all relevant information to DUPONT on a continuing basis regarding any significant change in composition, proposed uses, and applications of Products and countries to which Products will be distributed (or any other change relating to Products relevant to product stewardship).

c) LICENSEE's failure, 1) to conform to the product stewardship principles herein or 2) to provide the information necessary for DUPONT to perform the applicable audit for Product Stewardship valuation as determined by DUPONT, shall entitle DUPONT to terminate this Agreement in accordance with, in its sole judgment, the provisions of Section 8(a) below.

d) LICENSEE hereby acknowledges the following:

(1)    That the requirements of this section are intended to assist DUPONT as licensor of the trademarks in selecting licensees who will use adequate product stewardship as required herein with respect to the Products.  These requirements do not and are expressly not intended to substitute DUPONT as the product steward for the Products.

(2)    That as the manufacturer of the Products, LICENSEE is in the best position to exercise effective product stewardship with regard to its Products, its customers and other product users, its employees, contractors, distributors, and suppliers.

(3)    That LICENSEE shall be responsible for the product stewardship of all Products.

4

    (4)    That regarding subsection b) (2) of this Section 5, LICENSEE is responsible for determining whether or not any change is a "significant change" that requires LICENSEE to notify DUPONT and provide all relevant information.

    (5)    While DUPONT may, on occasion, on a gratuitous basis provide suggestions regarding elements of good stewardship systems, nevertheless, LICENSEE, in meeting its product stewardship obligations, shall rely on its own stewardship systems, resources and personnel and not upon the systems, resources and personnel of DUPONT.

6.   LICENSING NOTICE:  LICENSEE shall include a notice on all labeling, packaging, hang tags, advertising, Products literature, Internet sites, sales, and promotional material that the Trademarks are licensed from DUPONT.  The notice shall be as follows or as otherwise specified in writing by DUPONT:

> "The DuPont Oval logo, DuPont™, The miracles of science™, and Teflon® are registered trademarks or trademarks of DuPont and are used under license by SealMaster Industries, Inc."

LICENSEE shall submit to DUPONT, with a copy to EMI, prior to use, copies of all proposed original and revised promotional materials, advertisements, Internet web pages, labels, packaging, hang tags, and other materials displaying or bearing the Trademarks (hereinafter collectively referred to as "Copy").  Concurrent oral notice of same shall also be provided to DUPONT and EMI.  Within fifteen (15) days of receipt of such Copy, DUPONT will approve or reject same; if DUPONT fails to respond within fifteen (15) days, then the Copy will be deemed to be rejected.  If DUPONT rejects such Copy, then LICENSEE will modify such Copy as required by DUPONT.

LICENSEE shall comply with the Trademark Use Rules set forth in Exhibit B and the then current Identity Standards of DUPONT.

DUPONT may modify the Trademark Use Rules upon thirty (30) days prior written notice to LICENSEE.

7. **NOTICES:** Notices hereunder will be provided as follows:

For DUPONT:

    a) E. I. du Pont de Nemours and Company
       DuPont Corporate Public Affairs
       1007 Market Street, D-11040
       Wilmington, DE 19898
       U.S.A.
       Telephone: (302) 774-0187
       Facsimile: (302) 773-2919
       Attention: Lynne Chappel, DuPont Licensing Brand Manager
       E-Mail: lynne.chappel@usa.dupont.com

    b) E. I. du Pont de Nemours and Company
       DuPont Legal
       Trademark Group
       1007 Market Street, D-4058-1
       Wilmington, DE 19898
       U.S.A.
       Telephone: (302) 774-7305
       Facsimile (302) 773-0461
       Attention: David J. Gould, Corporate Trademark Counsel
       E-Mail: david.j.gould@usa.dupont.com

For EQUITY MANAGEMENT, INC.

       Equity Management, Inc.
       4365 Executive Drive, Suite 1000
       San Diego, CA 92121
       U.S.A.
       Telephone: (858) 558-2500
       Facsimile: (858) 558-2507
       Attention: Mr. Glen Konkle, President
       E-Mail: gkonkle@equitymanagementinc.com

For LICENSEE:

       SealMaster Industries, Inc.
       2520 South Campbell Street
       Sandusky, OH 44870
       U.S.A.
       Telephone: (419) 626-4375
       Facsimile: (419) 626-5477
       E-Mail: rick@sealmaster.com.net
       Attention: Rick Noon

8. **TERM AND TERMINATION:** Unless terminated or cancelled as provided herein this Agreement shall become effective upon the Effective Date and shall continue in full force and effect through December 31, 2009. In the event of termination or cancellation, neither party shall be liable for any

loss, expense, liability, termination compensation, or payments of any kind, including, but not limited to any investment, promotion or selling expense. Notwithstanding the foregoing, LICENSEE shall have the option to terminate this Agreement without cause at the end of Contract Year 3 provided the Running Royalties generated during Contract Year 3 do not equal or exceed LICENSEE's Guaranteed Royalty obligation for the same Contract Year outlined in Exhibit A. In the event LICENSEE exercises its option under this provision, LICENSEE shall pay to DUPONT the Guaranteed Royalties for Contract Year 1-3, if not already paid, and Guaranteed Royalties for Contract Years 4 and 5 shall be waived.

a) **Termination by Default:** If in DUPONT's sole discretion:

    (1) LICENSEE is failing to comply fully with the terms of this Agreement, as agreed; or

    (2) LICENSEE is using the Trademarks on Products that: (i) are defective or unsuitable in any way; (ii) reflect adversely on DUPONT or the Trademarks; or (iii) otherwise fail to meet the quality control standards of DUPONT or such standards have not been submitted to DUPONT as may be required herein,

then DUPONT shall at its sole discretion so advise LICENSEE of its breach of this Agreement by written notice and LICENSEE shall cease and correct the objectionable practices immediately upon receipt of DUPONT's notice. If such objectionable practice is not corrected within thirty (30) days of such notice, then DUPONT shall have the right to terminate this Agreement at any time thereafter upon written notice or DUPONT may require that LICENSEE suspend the use of the Trademarks in connection with any Products affected until DUPONT advises LICENSEE that it may resume use of the Trademarks under such conditions as DUPONT may determine. In addition, if DUPONT so requests, LICENSEE shall remove or obliterate the Trademarks, at LICENSEE's expense, from all affected Products in possession of LICENSEE's customers or their customers. If removal or obliteration of the affected Trademarks are impossible or impracticable, LICENSEE shall provide written notification to all of the LICENSEE's customers that the Products in question should not have been identified with or promoted in connect with the Trademarks. Notwithstanding anything to the contrary herein, if LICENSEE discontinues sale of Products, then this Agreement shall be automatically terminated.

b) **Cancellation:** This Agreement may be immediately canceled by DUPONT, at its sole discretion, upon written notice to LICENSEE to that effect, should any of the following occur: 1) if a petition in bankruptcy is filed, a judgment is entered against LICENSEE or if LICENSEE is adjudged a bankrupt; 2) if LICENSEE takes advantage of any insolvency act or debtor's relief act; 3) if LICENSEE makes an assignment for the benefit of its creditors; 4) if at any time DUPONT is concerned about the financial condition of the LICENSEE; 5) if any of its Products are recalled for any reason and LICENSEE refuses or fails to correct the condition or defect that caused the recall; 6) if the business or assets of LICENSEE, or any portion thereof, are or are threatened to be seized, nationalized, confiscated or expropriated; or 7) if, without DUPONT's prior, written approval, a majority of the capital stock or shares or other controlling interest in LICENSEE should be sold or a contract made for the sale thereof, or if ownership or control of LICENSEE's business shall otherwise change, or if LICENSEE shall acquire a majority interest in a company competing with DUPONT.

c) **Disposal of Stock:** For a period of ninety (90) days following the expiration (but not after the cancellation or termination) of this Agreement, LICENSEE may sell-off and deliver Product that is on hand at time of such expiration ("Sell-Off"). Such Product may only be sold in accordance with this Agreement and in the normal course of business and at normal selling prices. All payments and reports with respect to the Sell-Off will be made in accordance with this Agreement. DUPONT will have the right to conduct inspections of inventories prior to and during the Sell-Off upon prior written notice. Except as otherwise permitted for such Sell-Off, after expiration or termination of this Agreement, LICENSEE shall have no further right to use the Trademarks or manufacture, authorize any third party to manufacture, advertise, distribute, sell, promote or otherwise deal in any Products or products that use the Trademarks.

d) **Renewal:** Ninety days prior to the expiration of this Agreement, LICENSEE shall have the option by written notice to DUPONT to renew this Agreement for an additional five (5) contract years from the date of expiration of the Term, provided this Agreement has not been terminated in accordance with the provisions set forth and LICENSEE shall have paid DUPONT a minimum of $375,000.00 in earned royalties for the period defined as the last six (6) months of Contract Year 4 plus the first six (6) months of Contract Year 5. Upon renewal, Minimum Royalties will be due for the second 5 year period as defined in Exhibit A.

9. **CHOICE OF LAW:** This Agreement is acknowledged to have been made in and shall be governed by and construed in accordance with the laws of the State of Delaware, United States of America, without regard to the choice of law or conflicts of law principles thereof. Any actions under this Agreement shall be brought only in the state or federal courts in the City of Wilmington, Delaware, United States of America. LICENSEE hereby submits to the jurisdiction of such courts.

10. **NO CONSEQUENTIAL DAMAGES:** In no event shall either party be liable for any special, indirect, incidental, punitive, consequential, or any similar damages whether or not caused by or resulting from the negligence of such party even if such party has been advised of the possibility of such damages, in relation to, arising out of or in connection with this Agreement or the Trademarks.

11. **INDEMNITY:**

(a) DUPONT and EMI assume no liability to LICENSEE or any third parties with respect to the performance characteristics of the Products manufactured, sold, or distributed by LICENSEE. LICENSEE hereby indemnifies, defends, and holds DUPONT, EMI, and their officers, shareholders, employees, and agents, harmless from and against any and all claims, suits, obligations, causes of action, liabilities, costs, and damages (including without limitation reasonable attorney's fees and court costs, injuries to persons and damages to property, products liability claims, and claims for environmental harms) based upon, arising out of, or directly or indirectly related to, the operations or business conducted by LICENSEE under this or related to this Agreement (including without limitation the design, testing, manufacture, sale, distribution, marketing, use, display, advertising, or promotion of Products sold or promoted in connection with any of the Trademarks); provided, however, that such indemnity shall not apply to the extent of problems related to DUPONT's supply of ingredients not meeting specifications. Said indemnity shall further extend to LICENSEE's performance or nonperformance under this Agreement, including any default on the part of LICENSEE, whether or not any such violation or failure to comply has been disclosed to DUPONT. This indemnity and all representations and warranties made by the Parties herein or in any instrument or document furnished in connection herewith shall survive termination of the Agreement. LICENSEE will be promptly informed of claims.

8

(b) LICENSOR hereby indemnifies, defends, and holds LICENSEE harmless from and against any and all claims, suits, obligations, causes of action, liabilities, costs, and damages (including without limitation reasonable attorney's fees and court costs, injuries to persons and damages to property, products liability claims, and claims for environmental harms) based upon, arising out of, or directly or indirectly related to any claim of infringement or dilution of the Trademarks provided the Trademarks are used as required by this Agreement. This indemnity and all representations and warranties made by the Parties herein or in any instrument or document furnished in connection herewith shall survive termination of this Agreement.

12. **INSURANCE:** LICENSEE shall obtain and maintain at its sole cost and expense throughout the Term and renewal of this Agreement, and for a period of five (5) years following the termination or expiration of this Agreement, commercial general liability insurance (including product liability, advertiser's and contractual liability coverage) on an occurrence based policy form in the minimum amount of ten million dollars ($10,000,000.00) combined single limit for personal injury and property damage (on a per occurrence basis) and a deductible not to exceed five hundred thousand dollars ($500,000) to cover LICENSEE's obligations under this Agreement. Such insurance shall be underwritten by an insurance company with a Best's rating of at least A-/XII and licensed to do business in the Territory. DUPONT and EMI shall be named as additional insureds on such insurance. Insurance policies shall not contain cross-claim, cross-suit, or other such exclusion clauses which would preclude additional insured parties from instituting causes of action against other insureds under the policy or which would otherwise limit coverage of additional insureds. Certificates of insurance in a form reasonably acceptable to DUPONT evidencing the insurance coverage so required shall be sent to DUPONT and EMI at the addresses set forth herein above, prior to the effective date of this Agreement. Such certificates shall provide that the insurer will give DUPONT and EMI not less than thirty (30) days advance written notice of any change in or cancellation of coverage.

13. **CONFIDENTIALITY:** It is anticipated that each Party ("Receiving Party") will obtain information about the other Party's business and technology that the other Party ("Disclosing Party") considers to be confidential. In order to promote the free exchange of information, each Party agrees to maintain the information that it receives from the other Party in confidence and not disclose it to any third party for three (3) years after the expiration, termination or cancellation of this Agreement, provided that, in the case of oral or visual disclosure, such information shall be identified in writing as confidential within thirty (30) days of the oral or visual disclosure. This obligation of secrecy, however, shall not apply to information which:

a)   is known to the public at the time of its disclosure, or becomes known to the public after the disclosure through no fault of the Receiving Party;

b)   the Receiving Party can show was in its possession after the time of the disclosure, from a third party not under an obligation of secrecy to the Disclosing Party;

c)   the Receiving Party can show was developed by, or for, the Receiving Party independent of the disclosure by the Disclosing Party;

d)   is necessarily disclosed to a third party pursuant to the commercial sale of Products; or,

e) is required to be disclosed by law.

Notwithstanding the foregoing provisions, the Parties recognize that each Party will be obtaining information about the other Party's business which the Receiving Party knows or should know is considered to be confidential by the Disclosing Party even though that information is not susceptible to written identification as confidential. Each Party shall treat such information with the same degree of care that it treats its own information of a similar nature.

14. **ASSIGNMENT:** This Agreement may be assigned by DUPONT upon sixty (60) days advance written notice. Neither this Agreement nor the rights or obligations herein can be assigned by LICENSEE, in whole or in part, without the prior written consent of DUPONT.

15. **DISCLAIMER:** Notwithstanding any other provision of this Agreement to the contrary: ALL LICENSES IN THIS AGREEMENT, INCLUDING WITH RESPECT TO ALL TRADEMARKS AND DOMAIN NAMES, ARE BEING MADE WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY NATURE,

   a) AS TO THEIR VALUE OR FREEDOM FROM ENCUMBRANCE,

   b) AS TO ANY WARRANTY (EXPRESS OR IMPLIED, ORAL OR WRITTEN) OF TITLE, PURPOSE (WHETHER OR NOT A PARTY OR ITS AFFILIATES KNOWS OR HAS REASON TO KNOW ANY SUCH PURPOSE), OR ANY OTHER MATTER, INCLUDING THE COMPLETENESS OR SUFFICIENCY OF THE TRADEMARKS AND DOMAIN NAMES LICENSED HEREUNDER WHETHER ALLEGED TO ARISE BY LAW, BY REASON OF CUSTOM OR USAGE IN THE TRADE, BY COURSE OF DEALING OR OTHERWISE; OR

   c) AS TO THE LEGAL SUFFICIENCY TO GRANT ANY RIGHTS THEREIN.

LICENSOR and LICENSEE hereby acknowledge and agree that ALL LICENSES IN THIS AGREEMENT, INCLUDING WITH RESPECT TO ALL TRADEMARKS AND DOMAIN NAMES, ARE BEING GRANTED "AS IS, WHERE IS."

16. **SURVIVAL:** Notwithstanding termination, cancellation, or expiration of this Agreement (collectively "Termination"), all provisions of this Agreement, to the extent necessary to interpret the rights and obligations of the Parties prior to such Termination, and/or enforce same and to Sell-Off remaining inventory as may be permitted herein, shall survive Termination.

17. **COMPLETE CONTRACT:** This Agreement and its exhibits contain the entire contract and understanding between the parties regarding the subject matter herein. There are no representations or understandings, oral or written, express or implied, that are not merged herein. This Agreement may not be modified or terminated orally. No alleged modification, termination, or waiver shall be binding unless it is set out in writing and signed by the party against which it is sought to be enforced; and all prior agreements and/or understandings oral or written, express or implied, between the parties with respect to the subject matter hereof are hereby terminated.

IN WITNESS WHEREOF, the parties have executed this Agreement in duplicate by their duly authorized representatives as of the day and year first above written.

Approved by: _____
Lynne Chappel
DuPont™ Licensing Brand Manager
DuPont Public Affairs
E. I. DU PONT DE NEMOURS AND COMPANY

Approved by: _____
Print Name:

Scott F. Nelson
Global Manager for the DuPont™ Brand
E. I. DU PONT DE NEMOURS AND COMPANY

LICENSOR:                                    LICENSEE:

E. I. DU PONT DE NEMOURS AND COMPANY
Wilmington, Delaware, U.S.A.

By: _____         By: _____
Printed Name: _____         Printed Name: _____ David Thorson
Title: _____ Assistant Secretary         Title: _____ President
DuPont Legal Trademark Attorney Initials: _____

By: _____
Printed Name: _____
Title: _____
DuPont Legal Trademark Attorney Initials: _____

EXHIBIT A

1. **DEFINITIONS:**

"Trademarks" shall mean: The DuPont Oval trademark, the DuPont™ straightline trademark, and The miracles of science™ trademark (collectively, the "DuPont Brand Trademarks")

"Territory" shall mean the United States, its possessions and territories, and Canada.

"Field of Use" shall mean Do-It-Yourself sealants and coatings limited to driveway, roofing and foundation products.

"Distribution Channels" shall mean mass merchandise stores, hardware stores, direct mail, home centers, lumberyards and specialty stores including SealMaster Franchise Stores.

"Products" shall mean:
| | |
|---|---|
| Category I | Polymer-modified driveway sealant and crack filler |
| Category II | Acrylic, cold-water based roof sealers and asphalt-based roof sealers |
| Category III | Acrylic, water-based foundation sealers and asphalt-based foundation sealers |

All of such Products shall exhibit premium performance and shall be positioned as LICENSEE's premium offering for these Categories. It is understood that LICENSEE can offer, under other brands, driveway, roofing, and foundation products that do not have premium performance.

Selling Price means: With respect to any quantity of Products subject to royalty under this Agreement that is sold by LICENSEE (or any affiliate of LICENSEE licensed by DUPONT) to any third party, Selling Price shall be the gross sales price for that quantity, less any discounts and allowances to customers and commissions paid to distributors and other sales agencies, that are included in its gross sales price.

No deduction from the gross sales price shall be made for any item of cost incurred by the seller in its own operations incident to the manufacture, sale, or shipment of the product sold. Affiliate means: (1) any corporation owning or directly or indirectly controlling at least fifty percent (50%) of the stock normally entitled to vote for election of directors of a party and (2) any corporation owned or directly or indirectly controlled by a party, or by a corporation defined by item (1) of this sentence, through ownership of at least fifty percent (50%) of stock normally entitled to vote for election of directors. Such royalty shall be a fixed, absolute obligation of LICENSEE and is not subject to refund, recovery, or adjustment in any manner whatsoever, notwithstanding any election by DUPONT to terminate the Agreement.

2. **ROYALTIES, PAYMENTS, REPORTS, AND RECORDS:**

   a) Royalties, Annual Minimum Payments, and Advance Payment:

      (1) Royalties: In consideration of the rights granted hereunder, LICENSEE will pay DUPONT a royalty rate of four percent (4%) of the Selling Price. Such percentage royalties are based on the Selling Price of all quantities of Products sold with, in conjunction with, in association with, using, or using the benefit of the Trademarks.

12

(2) <u>Annual Minimum Payments</u>: Will be as follows:

| Annual Period | Start Date | End Date | % Royalty | Minimum Guarantee |
|---|---|---|---|---|
| Year 1 | 01/01/04 | 12/31/05 | 4% | $200,000 |
| Year 2 | 01/01/06 | 12/31/06 | 4% | $250,000 |
| Year 3 | 01/01/07 | 12/31/07 | 4% | $300,000 |
| Year 4 | 01/01/08 | 12/31/08 | 4% | $350,000 |
| Year 5 | 01/01/09 | 12/31/09 | 4% | $400,000 |

| Annual Period | Start Date | End Date | % Royalty | Minimum Guarantee |
|---|---|---|---|---|
| Year 6 | 01/01/10 | 12/31/10 | 4% | $400,000 |
| Year 7 | 01/01/11 | 12/31/11 | 4% | $400,000 |
| Year 8 | 01/01/12 | 12/31/12 | 4% | $400,000 |
| Year 9 | 01/01/13 | 12/31/13 | 4% | $400,000 |
| Year 10 | 01/01/14 | 12/31/14 | 4% | $400,000 |

(3) <u>Advanced Payment</u>: Upon LICENSEE's signing of this Agreement, there shall be due an Advance Payment of $150,000.00, which shall accrue against future earned royalties.

Marketing of the Products shall begin by January 1, 2005.

b) <u>Payments</u>: All payments made hereunder shall be by check or wire transfer made payable to EMI in U.S. dollars drawn on an American bank, as designated by DUPONT. Within thirty (30) days after the end of each calendar quarter, the royalties due hereunder will be remitted to EMI with a copy to DUPONT. If the royalties for any calendar quarter do not equal or exceed one-fourth of the Annual Minimum Payments for the year that includes such quarter, then the difference between one-fourth of such Annual Minimum Payments and such royalties ("Shortfall") will be remitted to DUPONT within thirty (30) days after the end of such calendar quarter.

After the payments are sent either by wire transfer or mail, LICENSEE shall notify the following via facsimile that such payments were made enclosing a copy of the wire transfer receipt or cover letter for mail payments together with the royalty and annual minimum payment calculations and sales reports as provided herein below:

1) E. I. du Pont de Nemours and Company
DuPont Corporate Public Affairs
1007 Market Street, D-11040
Wilmington, DE 19898
U.S.A.
Phone: (302)774-0187
Facsimile: (302) 773-2919
Attn: Lynne Chappel, DuPont Licensing Brand Manager
E-mail: lynne.chappel@usa.dupont.com

2) E. I. du Pont de Nemours and Company
   1007 Market Street
   Cashier's Office, Room D8003
   Wilmington, DE 19898
   U.S.A.
   Telephone: (302) 892-0921
   Facsimile: (302) 773-3763
   Attention: Phil W. Bur

c) <u>Late Payments:</u> If any payments due are not timely paid, then LICENSEE shall pay interest on the amount owed at a rate of one and one-half percent (1.5%) per month (or the maximum rate allowed by law if lower) from the date such amount was due until it is paid. If it becomes necessary for DUPONT to undertake legal action to collect any such payments, LICENSEE shall pay DUPONT's reasonable legal fees and costs of the action and related negotiations if the legal action undertaken results in a determination that the payments were due.

d) <u>Records:</u> LICENSEE shall keep adequate records in sufficient detail to enable the payments due to DUPONT hereunder to be determined. Said records shall be maintained for a period of three (3) years following submission of the Report to which such records pertain. Upon fifteen (15) days' prior written notice by DUPONT, LICENSEE shall permit said records to be inspected, and employees of LICENSEE associated with performance under this Agreement to be interviewed, at DUPONT's expense, at anytime during regular business hours by an independent auditor appointed by DUPONT, and reasonably accepted to LICENSEE. The auditor shall determine and report to DUPONT only the amount of the payments due and details concerning any underreporting, as well as adherence to any other requirements under the Agreement. If such audit discloses any underreporting, LICENSEE shall immediately pay DUPONT such underreported amount along with interest calculated pursuant to the terms set forth herein. If the audit determines an underpayment in excess of five percent (5%), LICENSEE shall reimburse DUPONT for the cost of the audit.

e) <u>Sales Reports:</u> Within thirty (30) days following each calendar quarter, LICENSEE shall furnish to the same recipients as the payment designations specified above a complete and accurate statement, in a format acceptable to DUPONT, of sales of Products, subject to royalty hereunder, during the preceding calendar quarter. For each country within the Territory, the report shall specify the following: (1) a description of the Product; (2) unit price of the Product; (3) the number of units sold in each country; and (4) the amount due. Such report shall be submitted whether or not any sales of the Products occurred during the preceding calendar quarter. Payment shall be made at the same time as submission of the reports. The receipt or acceptance of any of the statements furnished or royalties paid by LICENSEE shall not preclude DUPONT from questioning their accuracy at any time during an audit.

f) **Tax Clause:** LICENSEE shall pay all taxes and charges imposed by any government or taxing authority (other than the United States of a subdivision thereof) with respect to payments by LICENSEE to DUPONT or transfer of rights hereunder. Notwithstanding the foregoing, to the extent LICENSEE is required by any applicable income tax law to withhold a portion of the payment owing to DUPONT hereunder, DUPONT shall accept the resulting net payment as due performance under this Agreement. LICENSEE shall, however, take all necessary steps to secure the benefit of any reduction of withholding tax rate available under treaty and shall promptly provide DUPONT with a receipt for any tax withheld. Receipts should be sent to:

> E. I. du Pont de Nemours and Company
> Federal and International Tax Operations
> DUPONT Finance, Room D-13188-3A
> Wilmington, DE 19898
> U.S.A.

g) **Currency Conversion:** Royalties shall be paid in United States (U.S.) currency. For converting into U.S. currency royalties accrued in non-U.S. currency, LICENSEE will convert the non-U.S. currency using the "Interbank Rate-median ask price" on the currency Internet web site at http://www.oanda.com/converter/classic for the business day two (2) days prior to the date of payment or, in case of late payment, the last business day of the quarter for which payment is being made.

15

**EXHIBIT B**

*Rules for Using the Trademarks*

RULE 1:  BE DISTINCTIVE.  Make the Trademarks distinctive from the surrounding text each and every time.  Use only the distinctive forms of usage for the Trademarks that are provided by DuPont.

RULE 2:  SHOW REGISTRATION STATUS.  Show the proper registration status each and every time the Trademark appears.

Use "®" if the Trademark has been registered.  Use (™) if the trademark is not yet registered.

RULE 3:  AUTHORIZED USER – LICENSING NOTICE. – Use the licensing notice specified elsewhere in this Agreement.

RULE 4:  DO NOT CHANGE THE TRADEMARKS.  The Trademarks must be used only in the exact form in which registered.  Therefore, do not use as a possessive, hyphenate, separate or split even if at the end of a line of text.  Do not change the shape, size or style.

RULE 5:  DO NOT INCORPORATE A DUPONT TRADEMARK IN A DOMAIN NAME OR URL.  You may refer to the trademark in your web site as part of the product portfolio you sell, but the Trademarks should not be used as a domain name or email address.

RULE 6:  At least once per page, use an appropriate generic term for the Trademarks.

## EXHIBIT C

PRODUCT STEWARDSHIP RESPONSIBLE CARE® CODE OF MANAGEMENT PRACTICES

### Management Leadership and Commitment

1. LEADERSHIP: Demonstrates senior management leadership through written policy, active participation and communication.

2. ACCOUNTABILITY and PERFORMANCE MEASUREMENT: Establishes goals and responsibilities for implementing product stewardship throughout the organization. Measures performance against these goals.

3. RESOURCES: Commits resources necessary to implement and maintain product stewardship practices.

### Information and Characterization

4. HEALTH, SAFETY and ENVIRONMENTAL INFORMATION: Establishes and maintains information on health, safety, and environmental hazards and reasonably foreseeable exposures from new and existing products.

5. PRODUCT RISK CHARACTERIZATION: Characterizes new and existing products with respect to their risk using information about health, safety, and environmental hazards and reasonably foreseeable exposures. Establishes a system that initiates re-evaluation.

### Risk Management

6. RISK-MANAGEMENT SYSTEM: Establishes a system to identify, document, and implement health, safety and environmental risk-management actions appropriate to the product risk.

7. PRODUCT and PROCESS DESIGN and IMPROVEMENT: Establishes and maintains a system that makes health, safety and environmental impacts—including the use of energy and natural resources—key considerations in designing, developing and improving products and processes.

8. EMPLOYEE EDUCATION and PRODUCT USE FEEDBACK: Educates and trains employees, based on job function, on the proper handling, recycling, use, and disposal of products and known product uses. Implements a system that encourages employees to feed back information on new uses, identified misuses or adverse effects for use in product risk characterization.

9. CONTRACT MANUFACTURERS: Selects contract manufacturers who employ appropriate practices for health, safety and environmental protection for the operations under contract, or works with contract manufacturers to help them implement such practices. Provides information and guidance appropriate to the product and process risk to foster proper handling, use, recycling and disposal. Periodically reviews performance of contract manufacturers.

10. SUPPLIERS: Requires suppliers to provide appropriate health, safety and environmental information and guidance on their products. Factors adherence to sound health, safety, and environmental principles, such as those contained in Responsible Care into procurement decisions.

17

11. DISTRIBUTORS:  Provides health, safety and environmental information to distributors. Commensurate with product risk, selects, works with and periodically reviews distributors to foster proper use, handling, recycling, disposal and transmittal of appropriate information to downstream users. When a company identifies improper practices involving a product, it will work with the distributor to improve those practices. If, in the company's independent judgment, improvement is not evident, then the company should take further measures — up to and including termination of the business relationship. This Management Practice should be implemented in conjunction with the Distribution Code of Management Practices.

12. CUSTOMERS AND OTHER DIRECT PRODUCT RECEIVERS:  Provides health, safety and environmental information to direct product receivers. Commensurate with product risk, works with them to foster proper use, handling, recycling, disposal, and transmittal of appropriate information to downstream users. When a company identifies improper practices involving a product, it will work with the product receiver to improve those practices. If, in the company's independent judgment, improvement is not evident, then the company should take further measures — up to and including termination of product sale.

EXHIBIT D

DUPONT PROTOCOL FOR ASSESSING THE STEWARDSHIP SYSTEMS OF LICENSEE

For Products sold or to be sold with the Trademarks, DUPONT will take reasonable steps to assure itself that the LICENSEE has appropriate stewardship systems in place to adequately evaluate product risks to people and the environment. This protocol is designed to assess the adequacy of LICENSEE stewardship systems. It is not DUPONT's intention in conducting such a review to substitute its own product review for that of the LICENSEE's. LICENSEE is closer to its own markets and applications, and therefore is in a much better position to assess the risks associated with the licensed products as they relate to its employees, customers, suppliers, distributors, contractors, consumers and other parties, so long as adequate stewardship systems are in place. Therefore, the focus of this protocol is the stewardship systems themselves.

In keeping with the above principles, DUPONT will expect and require that LICENSEE conduct its own product reviews for Products (both pre-market reviews and continuing reviews after commercialization). Such review(s) should be conducted by the LICENSEE prior to the Review of Product Stewardship Systems covered by this protocol, using the LICENSEE's internal stewardship resources and/or consulting services contracted for by LICENSEE. DUPONT will not organize the product reviews or schedule them. LICENSEE's will be expected to collect any data or do any research required to support the review. Without actually conducting such activities, however, DUPONT may provide advice as appropriate on the kinds of considerations that should go into a product review, the kinds of data that might be necessary to assess the product, the kinds of personnel whose competencies should be represented in the review, etc.

DUPONT may revise this Protocol from time to time at its sole discretion.

## BACKGROUND:

- Assign or review the product stewardship class (I, II, III). Note: Consult with the DUPONT Product Stewardship coordinator for help in assigning these (the Classes are based on hazards and represent a 2, 3 or 4 year stewardship review cycle).

- Note: In addition to the above cycle there are "triggers" (see Triggers attachment) that should be used to manage change (such as any feedback issues, new hazard or exposure information, etc.). These should be used to help determine if specific stewardship issues need to be discussed and the risk characterization and risk management actions documented.

- If this is re-review – when was the last review conducted?

- Have all action items from the last review been closed out?

I.  **Product Description & Trail:** For new & modified products & new applications of existing products Product Description/grades

    1.  Note this is a brief overview. Briefly describe the product and its end use. Provide a sketch of a product trail–use boxes and arrows. Show significant suppliers and contract manufacturers, distributors, customers, etc. Show each country.

    2.  Will this include "second" quality or co-products or waste that is now product? When will they be reviewed?

3. **Production/Shipping Sites**
   a) Your sites
   b) Coproducers / Repackagers/ contract manufacturers
   c) Distributors/ resellers ? Brokers ?
   d) Terminals, warehouses
   e) Any major gaps in the trail?
   f) E –commerce?

4. **Amount Sold (estimated approximate or ranges)**

5. **Describe End Users**
   a) First Customer(s)
   b) Ultimate customer ?

## II.    Hazard Characterization:

What do we know? Assemble vendor data; internet searches; any literature searches for human and ecological toxicology; etc. If there is limited data, does this material have similar structure to other characterized materials? Would this suggest any concerns or data gaps to be filled?

1. **Product Composition**
   a) Have all intentionally added materials been identified? Have known impurities been identified based on risk?
   b) What systems would detect changes in product composition from manufacture or raw materials?

2. **Physical Hazards**
   a) Fire & Explosion; static potential
   b) Reactivity, Incompatibility, polymerization, corrosiveness, etc.

3. **Human Toxicity Hazards**
   a) Summary of acute and chronic data and significance for humans.
   b) Are there exposure limits for workers? For customers' workers? For the community?

   –    For consumers? For sensitive sub-populations? (Children, elderly, etc.)
        Should there be?

   c) Have there been any TSCA 8 (c) allegations? (since the last review) What is the system to train and to collect this data? How were these resolved?
   d) Has any TSCA 8 (e) data become available?
   e) Have any calls (medical, emergency, allegations, etc.) to the company been made? If so what were they and how were they resolved?
   f) Other input?

4. **Environmental Hazards**
   a) What is known about where in the environment (water, air, sediment, and fish) the product(s) molecules end up? (and significant emissions from the product use).
   b) Has the DuPont P & B tool been used on all products and all materials in mixtures?
   c) What is the Persistence in the various media & the potential for Bioaccumulation?
   d) What is known about environmental toxicity to fish, daphnia, algae, etc? If there is no aquatic tests has ECOSAR aquatic model been run?

    e)  Based on emissions/ discharges from use and Reasonably Foreseeable Misuse and disposal: Has the risk from predicted environmental concentrations for the key components been assessed vs the predicted no effect environmental concentration? (This is generally the aquatic media and most sensitive species). If professional judgment – state that.

    f)  Does this product have a global warming potential?   Or acid rain potential?

5.  **Status of Global Chemical Inventories**
What countries will this product be sold into?  Are the product components listed on the inventories of the producing & destination countries?
    a)  Is this product registered in those countries were required?
    b)  What system is used to track compliance and to prevent orders from being placed for non- compliant materials?  If not, how is this managed?
    c)  Any export/import controls?
    d)  See appendix A for TSCA specific questions. (Company systems should be in place to cover these "reminders".

6.  **Shipping & Storage Information & Requirements**
Is this regulated under international transport regulations? (DOT in the US; IMO for ocean shipment; IATA/ICAO for air)
    a)  Is there a strategy for packaging and carriers?
    b)  Are there Special requirements? Or labels? EG; gases that are released in storage?

7.  **Spill and Emergency Response**
Is there an Emergency Response Plan (for humans & Environment) & capability for response and clean up along the routes in all countries where shipped?
    a)  What is the customer's capability to respond?  Are there Reporting requirements?  Are there any special procedures or equipment needed?
    b)  Should the company assist in training the user's employees

III.    **Toll or Contract Manufacturer Issues—Think Global**

1.  What is the system to provide necessary SHE information to contract manufacturers?

    (a)  How have these Toll manufacturers been assessed for SH&E issues? Should their systems be reviewed on site?
    (b)  What protocol is used? – Was a trained assessor used?
    (c)  Is local exhaust ventilation needed?
    (d)  Is Protective equipment needed?

2.  Does the contract describe who is responsible for distribution, use, disposal, spills, emergencies, labels, msds's?

3.  Do these materials use DuPont labels & msds?

IV.    **Materials From Suppliers—Think Global**

1.  How are the suppliers' SH&E systems assessed?  If suppliers are distributors how are they assessing their suppliers?

2.  Are suppliers in developing nations used?  How has the company assessed them for SH&E issues and the potential for child or forced labor?  What is the path forward?

3. Questions that DuPont uses with supplies are available upon request.

V. **Distributor And Issues**

1. What system is in place to assess distributors? Does the business rely on distributors belonging to an initiative similar to Responsible Care?

2. Does the product(s) have any unique hazards such that a visit may be appropriate? Do the distributors open, repackage, formulate, re-label material? Do they generate emissions or waste from our materials?

3. Are there any SH&E concerns resulting from visits to/inspections of or feedback from distributors or carriers?

   (a) Do their workers have potential exposure our product or gases or vapors or dusts from our product during mixing or processing? If so -- What risk management techniques are used to protect their workers? Has the business assessed their exposure potential?
   (b) Do they pass on MSDS and literature?
   (c) Potential for misuse or improper use of product?
   (d) Any regulatory issues? Any permits required?
   (e) Emergency response at their site and in shipping?

4. If we have restrictions on product end use, how do we know they are advising their customers?

   (a) What is our feedback system?

VI. **MSDS/Label/Regulations/Training**

1. A MSDS for each individual product will need to be written. This is not a trivial process. What is the system for updating all the msds? -- How will and how often will customers receive updated msds? Which customers?

2. What is the system to prepare and update labels? Has the consumer product labeling been assessed for compliance with regulations where it will be sold?   Have the hazardous substances been identified and are the warnings in agreement with FHSA (for US sales)?

   - Has an assessment been done for label language that may go beyond regulations due to industry and Corporate standards / guidance?  And RFM? - See #1B.  If this will also be used in industrial settings does the label comply with ANSI and OSHA or country specific guidance/regulations?
   - Are there any special regulatory issues, e.g.: Prop 65 or FIFRA or FDA, UL, FTC (for "green" claims), etc? Has an expert help develop those labels? (Significant time delays may be required for the necessary regulatory clearances).

3. Have appropriate supplemental safety instructions such as: first aid guidance or spill clean up and disposal, fire fighting, storage, etc., been assessed and included if needed?

4. Is the labeling sufficiently clear to insure comprehension by the various types of consumers? Is the labeling language understood by the users in various locations & countries?  Should icons be used?

22

5. What is the system for obtaining and understanding the applicable regulations? - Have the available regulatory information (including global chemical inventories) for the chemical and similar chemicals, or polymer and similar polymers been assembled and reviewed, including a search of global regulatory databases. If not, what are the key data gathering and review needs? See part I of PPR.

6. Would this product be regulated under the various State (Calif, and others)' Federal and country regulations for VOC content? This can be a complex issue; Consult legal . Note the Refinish business has expertise on this topic.

7. Are any antimicrobial/ sanitization claims being made, and if so has the appropriate documentation been collected and the article been registered with the appropriate legal authorities? (Check country requirements: Biocide directive 98/8/EC or FDA, FIFRA in the USA)

8. Have the following been answered for each country the product will be sold in?

    (a) Have the stewards in those countries been informed and the country specific issues discussed?
    (b) Does the product contain components above the tolerated concentrations which are banned for consumers or which will require a special expertise of the reseller (EU directive 76/769/EEC).
    (c) Are the product and its components registered to the product register in various European countries?
    (d) Is the product labeled appropriately according to country laws and in local language?
    (e) Are the envisioned quantities of the product in compliance with country laws on storage?
    (f) Is the product in compliance with international rules (orange book of the UN) on transportation?
    (g) Is the product in compliance with country laws on disposal? Consider used and unused product.
    (h) Are there country laws on packaging and package disposal?
    (i) Is the product in compliance with country laws on storage?
    (j) Are we in compliance with any import/export laws?
    (k) Are there country environmental laws that must be adhered to?
    (l) What are the chemical reporting laws of the country?
    (m) M/SDS available according to national legislation and in the local language?

VII.  **Packaging / Stability / Distribution**

1. Has the packaging and its contents been assessed for stability covering reasonably foreseeable shipping, storage, usage, and disposal situations? (freezing and high heat). Is a performance tested packaging certified by an appropriate authority, used in case the product is classified "dangerous for transportation"?

    - Does the packaging need to be child resistant (consult an expert)?
    - What is the anticipated shelf life of the product under reasonably foreseeable shipping, selling, storage, and usage conditions? How long could it be expected to be in stores before being sold? Under what conditions should it be stored? (If not, what are the key data gathering and review needs?).

- Has the chemical, polymer, and product formulation been assessed for possible component interactions/ reactions, including possible negative impacts on phase stability and the ability to resist microbial growth?
- Note: In the EU a dangerous substance or preparations (mixtures) must have a tactile warning if they are offered to the general public and they are labeled: Very toxic or toxic (skull & crossbones); corrosive (symbol); harmful (St Andrews cross); highly flammable or flammable. Exempt are crop protection products. Consult with your EU steward.

2. See section V for questions on distribution. These are supplemental: Will the "big box" companies dictate the distributors? If so, how will the SHE systems be assessed?

## VIII.   Consumer Product End Use

1. Briefly review what consumer end use(s) this product will be used for and how it will be used. Note the assessment of contract manufacturers, suppliers, shipping status, etc., should have been reviewed in previous sections.

    - Has this product application been discussed with legal?
    - Are there any patents we need to be aware of?

2. Have "reasonably foreseeable misuses" (RFM) or unanticipated usage scenarios been discussed and those that have "some" probability been assessed for risks (consult with legal)? This should include usage, storage, disposal, and unexpected combined use with other products.
E.G: What human (children, infirm, etc) and environmental Exposures (water, food, cosmetic, etc) might result from any misuses?
What risk management practices will be taken to address those RFMs that had "some" probability? (Note: these RM actions can be addressed as appropriate in the following questions.)

3. What experience in the marketplace with similar products, chemicals, or polymers has raised any actual or perceived issues?

4. Human Toxicity: (note: refer to the Hazard/ Toxicology section of the FPR part I). Will / could the Product be ingested, inhaled, or applied to the skin during use either intentionally or inadvertently?

    - If yes, in what quantities, how often, and for how long?
    - If yes, will the existing toxicity data or models - including persistence and bioaccumulation potentials - help insure the safety of these types, frequencies, and magnitudes of exposures? Or are there data gaps?
    - Skin contact applications usually need human patch testing (see Haskell)
    - Complete compositional information must be obtained from all suppliers. (See Section IV.) Check with your global chemical coordinator to determine if any new Compounds have been created (i.e., do formulated ingredients react?). Appropriate efficacy and stability testing should be available for this review.
    - Has any actual consumer testing indicated any safety (e.g., skin irritation) or other issues? (If yes, what are the plans to address the issues?)
    - Have the relevant components of the product formulation been assessed for possible matrix and mixture effects, e.g., is it possible that one or more chemicals have skin permeation enhancement properties?

24

5. Will this product be used by multiple, diverse subgroups of people (e.g., age groups, male/female; those already stressed with illness; different cultures; etc.)?

   – If yes, will the existing data and testing program help insure the safety of all reasonably foreseeable subgroups exposed? For example, should human skin irritation and sensitization testing be expanded to include additional types of subgroups?
   (Note – Refer back to the review section on toxicity as a reminder.)

6. Has an appropriate human exposure limit or safe dose been established?
   Has an Exposure assessment been done (monitoring, calculations, models, etc) evaluating potential exposures from routine and reasonably foreseeable misuse?

   – Will use of our product significantly add to their background from other sources?
   – Will any end uses/ applications require protective equipment (glasses, hearing protection, respirators, impervious gloves, aprons, boots, etc) or special ventilation that the consumer may not normally use or have or wear? If so how will training and equipment availability be accomplished?

7. What are the physical hazards? (e.g., flammable, corrosive to metals, explosive, electrical, mechanical, etc).  This should include review of both product and packaging, e.g., any sharp edges or parts that could break-off?

   – What is the system for obtaining and assessing new hazard data?

8. Environmental risks: (see section IA Q4 part l). What media will this material as used and disposed partition to and how long will it reside? What are the predicted environmental concentrations from use, RFM and disposal, and is the safety factor sufficient vs the Predicted no effect level. (This is generally aquatic life)?  Does the risk assessment and management take into account any Persistence and or bioaccumulation issues?

   – What is the system for obtaining and assessing new hazard data?

9. Are storage regulations dependent on the quantity of product stored?  What if a package is broken and product comes out – is a spill plan needed?  Is Training or PPE needed?

## IX.   Disposal

1. What routes will be used to dispose of the product (and mixtures) after use, and what quantities will be disposed by each route?

   – Will this product end up in residential trash for landfill?  Or incineration?   Septic systems?  Or flushed to public or private treatment plants?  Or allowed to evaporate?
   – Are there any reporting requirements for disposal by various end users?
   – Are there any significant environmental impacts from these disposal routes; considering the persistence and bioaccumulation and toxicity and partitioning to various media.

2. How will packaging be disposed?  Will it be reused or recycled?

   – If not — why not?

--   How will compliance with the EU used packaging regulations be met?

X.  **Risk Perception and Risk Communication**

1.  Have Web search engine results indicated any noteworthy public, activist group, or
    regulatory agency issues to address for the chemical, polymer or product, or for similar
    materials?  (If yes, have plans been developed to proactively address the issues?)

2.  Have you critically reviewed the product literature, especially ad copy and pictures with
    regard to the potential to mislead the consumer?  Look for implied end uses that might not be
    consistent with the appropriate safe end use and disposal.

    --   Is the product literature/label consistent with the safety data sheet?

XI.  **Sustainable Growth and Certifications/Endorsements**

1.  What is the sustainable Growth strategy?  What are the footprint metrics and the societal value
    for this product?

2.  Have possible certifications and endorsements of the chemical, polymer, and/or product been
    considered?  As examples, these could include a Good Housekeeping seal of approval or a
    Greenguard certification (for low-emission indoor products) from non-profit Greenguard
    Environmental Institute (www.greenguard.org).  Or Scientific Certification systems  or Green
    Seal, etc.

3.  The Consumer Product Safety Commission web site has useful case studies and recalls and
    the ability to search for products.   You should reference this for similar products.
    http://www.cpsc.gov/

XII.  **Competition**

1.  Do other companies offer the same or similar product or chemical for a similar purpose, or
    for different purpose?  (If yes, would this increase the level of exposure impact in the
    environmental and human safety assessment in a meaningful way?)

2.  Could a competitor attempt to raise any safety or regulatory issues?  (If yes, have plans been
    developed to proactively address the issues?)

XIII.  **Training and Feedback Systems**

1.  Personnel Training

    a)  How has the company stewardship coordinator been trained in stewardship?
    b)  What system is used to train appropriate marketing/sales organization/technical
        service/customer contact personnel on the value of Product Stewardship?

        --   Is there a system for retraining (suggest every 3 yrs)?  What about people
             moving into different roles?  Or new hires?

    c).  Describe if any stewardship training of carriers, customers, downstream users has
         been done.

26

2. Describe the feedback systems to capture stewardship issues (both positive and "of concern"). How are these assessed for risk and how is this documented? How will potential misuses be monitored?

3. What is the system for obtaining and responding to consumer's questions or concerns?

   - What is the medical emergency system?
   - What is the system for managing customer safety, health or environmental allegations?

4. What is the system to keep DuPont informed of feedback & stewardship issues? How frequently will this occur?

5. How will any reporting obligations under the Consumer Product Safety Act (Check specific countries for similar requirements) be identified and managed? How will corrective actions be managed?

XIV.  **Risk characterization and Risk management**

   If the business is satisfied that the risks have been identified and appropriately managed then the sign off sheet at the end should be signed.

**Appendix A: TSCA Questions** (note most of these also have value for information generated outside of the US)

1) What system does the business have in place to insure that timely TSCA section 12(b) Export notifications are filled with EPA? How is this system update as new product codes are added or compositions changed? Or when chemicals are added or sunset by EPA?

2) What training has been given to Technical service or field sales or marketing personnel in handling customer allegations of health or environmental effects alleged to be caused by these products?

3) What is the communication process when a customer rep learns of such an allegation?

   - After allegations are processed within the business what further review and follow up is done with these allegations (both those subject to TSCA 8e as well as allegations of known effects not qualifying as recordable)?

4) For health or environmental effect allegations on products received by global subsidiaries or JV's, what is the communication process within the business?

5) For both commercial product and sample shipments imported into the US, what system is in place to insure TSCA inventory compliance and correct TSCA certification (including samples shipped via express courier).

6) How do you keep track of health and safety studies for any section 8d requirements in case of a section 4 rule?

27

7) How do you notify customers of any TSCA requirements?

8) What checks and balances are in place to ensure global inventory requirements are met when product is bought or sold?

SIGN OFF SHEET

THE UNDERSIGNED VERIFY THAT:

A PRODUCT STEWARDSHIP REVIEW WAS CONDUCTED FOR _____
(Note this should be used for both existing products and new products & applications or end uses)

Date Conducted_____

- The product review information is available _____ or electronically at _____
- The formal product review action items and names of responsible people assigned to the action items is available at _____ (or electronically at _____)
- The next product review is due _____(quarter / yr.)

This product is cleared for sale into the application(s) and end uses discussed in this product review.

_____ Business manager
_____ Product manager
_____ Product steward
_____ Legal

DJG/rpldr 4-13-04

S:\Trmwk\Gould, David\DuPont Brand Trademark License Agreements\SEALMASTER DuPont™ Brand Trademark License 4-13-04.doc

## Royalty Statement
## Territory Detail

Licensee Name:  ThorWorks Industries Inc. (SealMaster)     Reporting Period: Q1: January 1 to March 31, 2004
Licensor Name:  DuPont™

TERRITORY:    United States

| SKU ID | SKU Description | Selling Price | Units | Gross Sales | Adjusted Amount | Net Sales | Royalty Rate | Royalty Due |
|--------|-----------------|---------------|-------|-------------|-----------------|-----------|--------------|-------------|
| H6700 | 3.5 gallon driveway sealer | $7.80 | 0 | $0.00 | $0.00 | $0.00 | 4.00% | $0.00 |
| H6300 | 1 gallon pourable crack filler | $3.24 | 0 | $0.00 | $0.00 | $0.00 | 4.00% | $0.00 |
| H6400 | 1 quart pourable crack filler | $1.35 | 0 | $0.00 | $0.00 | $0.00 | 4.00% | $0.00 |
| H6500 | 1 gallon trowel grade crack filler | $3.18 | 0 | $0.00 | $0.00 | $0.00 | 4.00% | $0.00 |
| H6600 | 1 quart oil spot primer | $1.53 | 0 | $0.00 | $0.00 | $0.00 | 4.00% | $0.00 |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

If DuPont™ products were purchased as ingredients in the reported goods, please report DuPont™ product sales revenue:

| DuPont™ Product | Purchase Price | Quantity Purchased | Total DuPont™ Sales Revenue |
|-----------------|----------------|--------------------|-----------------------------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Total |  |  |  |

## Royalty Statement
## Territory Detail

Licensee Name:   ThorWorks Industries Inc. (SealMaster)    Reporting Period: Q2: April 1 to June 30, 2004
Licensor Name:   DuPont™

**TERRITORY:**   United States

| SKU ID | SKU Description | Selling Price | Units | Gross Sales | Adjusted Amount | Net Sales | Royalty Rate | Royalty Due |
|--------|----------------|---------------|-------|-------------|-----------------|-----------|--------------|-------------|
| H6700 | 3.5 gallon driveway sealer | $7.80 | 0 | $0.00 | $0.00 | $0.00 | 4.00% | $0.00 |
| H6300 | 1 gallon pourable crack filler | $3.24 | 0 | $0.00 | $0.00 | $0.00 | 4.00% | $0.00 |
| H6400 | 1 quart pourable crack filler | $1.35 | 0 | $0.00 | $0.00 | $0.00 | 4.00% | $0.00 |
| H6500 | 1 gallon trowel grade crack filler | $3.18 | 0 | $0.00 | $0.00 | $0.00 | 4.00% | $0.00 |
| H6600 | 1 quart oil spot primer | $1.53 | 0 | $0.00 | $0.00 | $0.00 | 4.00% | $0.00 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

If DuPont™ products were purchased as ingredients in the reported goods, please report DuPont™ product sales revenue:

| DuPont™ Product | Purchase Price | Quantity Purchased | Total DuPont™ Sales Revenue |
|-----------------|----------------|---------------------|------------------------------|
| | | | |
| | | | |
| | | | |
| | | | |
| Total | | | |

# Royalty Statement
## Territory Detail

Licensee Name: ThorWorks Industries Inc.
Licensor Name: DuPont™

Reporting Period: Q3: July 1 to September 30, 2004

TERRITORY: United States

| SKU ID | SKU Description | Selling Price | Units | Gross Sales | Adjusted Amount | Net Sales | Royalty Rate | Royalty Due |
|--------|-----------------|---------------|-------|-------------|-----------------|-----------|--------------|-------------|
| H6700 | 3.5 gallon driveway sealer | $7.80 | 8881 | $69,271.80 | $663.57 - | $68,608.23 | 4.00% | $2,744.33 |
| H6300 | 1 gallon pourable crack filler | $3.24 | 25920 | $83,980.80 | $118.80 - | $83,862.00 | 4.00% | $3,354.48 |
| H6400 | 1 quart pourable crack filler | $1.35 | 18084 | $24,413.40 | $  6.30 - | $24,407.10 | 4.00% | $  976.28 |
| H6500 | 1 gallon trowel grade crack filler | $3.18 | 17586 | $55,923.48 | $531.06 - | $55,392.42 | 4.00% | $2,215.70 |
| H6600 | 1quart oil spot primer | $1.53 | 4212 | $ 6,444.36 | $ 10.71 - | $ 6,433.65 | 4.00% | $  257.35 |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

If DuPont™ products were purchased as ingredients in the reported goods, please report DuPont™ product sales revenue:

| DuPont™ Product | Purchase Price | Quantity Purchased | Total DuPont™ Sales Revenue |
|-----------------|----------------|--------------------|-----------------------------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Total |  |  |  |

1

## Royalty Statement
### Territory Detail

Licensee Name:   ThorWorks Industries Inc.
Licensor Name:   DuPont™

Reporting Period: Q1: January 1 to March 31, 2005

TERRITORY:   United States

| SKU ID | SKU Description | Selling Price | Units | Gross Sales | Adjusted Amount | Net Sales | Royalty Rate | Royalty Due |
|--------|-----------------|---------------|-------|-------------|-----------------|-----------|--------------|-------------|
| H6700 | 3.5 gallon driveway sealer | $7.80 | 0 | $ 0.00 | $ 28.40 - | $ 28.40 - | 4.00% | $ 1.14 - |
| H6300 | 1 gallon pourable crack filler | $3.24 | 240 | $777.60 | $ 776.16 | $ 1,553.76 | 4.00% | $ 62.15 |
| H6400 | 1 quart pourable crack filler | $1.35 | 360 | $486.00 | $ 911.16 | $ 1,397.16 | 4.00% | $ 55.89 |
| H6500 | 1 gallon trowel grade crack filler | $3.18 | 240 | $763.20 | $ 785.26 | $ 1,548.46 | 4.00% | $ 61.94 |
| H6600 | 1 quart oil spot primer | $1.53 | 0 | $ 0.00 | $ 0.00 | $ 0.00 | 4.00% | $ 0.00 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

If DuPont™ products were purchased as ingredients in the reported goods, please report DuPont™ product sales revenue:

| DuPont™ Product | Purchase Price | Quantity Purchased | Total DuPont™ Sales Revenue |
|-----------------|----------------|--------------------|-----------------------------|
| | | | |
| | | | |
| | | | |
| | | | |
| Total | | | |

## Royalty Statement
## Territory Detail

Reporting Period: Q1: April 1 to June 30, 2005

Licensee Name:  ThorWorks Industries Inc.
Licensor Name:  DuPont™

TERRITORY:    United States

| SKU ID | SKU Description | Selling Price | Units | Gross Sales | Adjusted Amount | Net Sales | Royalty Rate | Royalty Due |
|---|---|---|---|---|---|---|---|---|
| H6700 | 3.5 gallon driveway sealer | $7.80 | 0 | $ 0.00 | $ 195.00 - | $ 195.00 - | 4.00% | $ 7.80 - |
| H6300 | 1 gallon pourable crack filler | $3.24 | 54 | $ 174.96 | $ 361.20 | $ 536.16 | 4.00% | $ 21.44 - |
| H6400 | 1 quart pourable crack filler | $1.35 | 0 | $ 0.00 | $ 24.75 - | $ 24.75 - | 4.00% | $ 0.99 - |
| H6500 | 1 gallon trowel grade crack filler | $3.18 | 54 | $ 171.72 | $ 42.40 - | $ 129.32 | 4.00% | $ 5.17 - |
| H6600 | 1 quart oil spot primer | $1.53 | 36 | $ 55.08 | $ 73.95 - | $ 18.87 - | 4.00% | $ 0.75 - |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

If DuPont™ products were purchased as ingredients in the reported goods, please report DuPont™ product sales revenue:

| DuPont™ Product | Purchase Price | Quantity Purchased | Total DuPont™ Sales Revenue |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Total |  |  |  |

## Royalty Statement
## Territory Detail

Licensee Name:  ThortWorks Industries Inc.
Licensor Name:  DuPont™

Reporting Period: Q3:  July 1 to September 30, 2005

**TERRITORY:**  United States – Menards Sales Dupont

| SKU ID | SKU Description | Selling Price | Units | Gross Sales | Adjusted Amount | Net Sales | Royalty Rate | Royalty Due |
|--------|-----------------|---------------|-------|-------------|-----------------|-----------|--------------|-------------|
| H6700 | 3.5 gallon driveway sealer | $7.80 | 17 – | $ 132.60 – | $  0.00 | $ 132.60 – | 4.00% | $  5.30 – |
| H6300 | 1 gallon pourable crack filler | $3.24 | 17 – | $ 55.08 – | $ 36.72 – | $ 91.80 – | 4.00% | $  3.67 – |
| H6400 | 1 quart pourable crack filler | $1.35 | 10 – | $ 13.50 – | $  9.00 – | $ 22.50 – | 4.00% | $  0.90 – |
| H6500 | 1 gallon trowel grade crack filler | $3.18 | 9 – | $ 28.62 – | $ 19.08 – | $ 47.70 – | 4.00% | $  1.91 – |
| H6600 | 1 quart oil spot primer | $1.53 | 4 – | $  6.12 – | $  4.08 – | $ 10.20 – | 4.00% | $  0.41 – |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

If DuPont™ products were purchased as ingredients in the reported goods, please report DuPont™ product sales revenue:

| DuPont™ Product | Purchase Price | Quantity Purchased | Total DuPont™ Sales Revenue |
|-----------------|----------------|--------------------|-----------------------------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Total | | | |

## Royalty Statement
### Territory Detail

Licensee Name:  ThorWorks Industries Inc.
Licensor Name:  DuPont™

Reporting Period: Q3: July 1 to September 30, 2005

**TERRITORY:**  United States – Other Sales Dupont

| SKU ID | SKU Description | Selling Price | Units | Gross Sales | Adjusted Amount | Net Sales | Royalty Rate | Royalty Due |
|---|---|---|---|---|---|---|---|---|
| H6700 | 3.5 gallon driveway sealer | $7.00 | 324 | $ 2,268.00 | $ 169.00 – | $ 2,099.00 | 4.00% | $ 83.96 |
| H6300 | 1 gallon pourable crack filler | $5.69 | 0 | $ 0.00 | $ 0.00 | $ 0.00 | 4.00% | $ 0.00 |
| H6400 | 1 quart pourable crack filler | $2.84 | 0 | $ 0.00 | $ 0.00 | $ 0.00 | 4.00% | $ 0.00 |
| H6500 | 1 gallon trowel grade crack filler | $5.69 | 0 | $ 0.00 | $ 0.00 | $ 0.00 | 4.00% | $ 0.00 |
| H6600 | 1 quart oil spot primer | $2.84 | 0 | $ 0.00 | $ 0.00 | $ 0.00 | 4.00% | $ 0.00 |
| H6900 | 5 gallon driveway sealer | $7.00 | 0 | $ 0.00 | $ 0.00 | $ 0.00 | 4.00% | $ 0.00 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

If DuPont™ products were purchased as ingredients in the reported goods, please report DuPont™ product sales revenue:

| DuPont™ Product | Purchase Price | Quantity Purchased | Total DuPont™ Sales Revenue |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Total | | | |

## Royalty Statement
## Territory Detail

Licensee Name: ThorWorks Industries Inc.
Licensor Name: DuPont™

Reporting Period: Q3: July 1 to September 30, 2005

TERRITORY:  United States – Sears Sales Dupont

| SKU ID | SKU Description | Selling Price | Units | Gross Sales | Adjusted Amount | Net Sales | Royalty Rate | Royalty Due |
|--------|-----------------|--------------|-------|-------------|-----------------|-----------|--------------|-------------|
| H6700 | 3.5 gallon driveway sealer | $7.00 | 324 | $ 2,268.00 | $ 169.00 – | $ 2,099.00 | 4.00% | $  83.96 |
| H6300 | 1 gallon pourable crack filler | $5.69 | 0 | $   0.00 | $  0.00 | $  0.00 | 4.00% | $  0.00 |
| H6400 | 1 quart pourable crack filler | $2.84 | 0 | $   0.00 | $  0.00 | $  0.00 | 4.00% | $  0.00 |
| H6500 | 1 gallon trowel grade crack filler | $5.69 | 0 | $   0.00 | $  0.00 | $  0.00 | 4.00% | $  0.00 |
| H6600 | 1 quart oil spot primer | $2.84 | 0 | $   0.00 | $  0.00 | $  0.00 | 4.00% | $  0.00 |
| H6900 | 5 gallon driveway sealer | $7.00 | 0 | $   0.00 | $  0.00 | $  0.00 | 4.00% | $  0.00 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

If DuPont™ products were purchased as ingredients in the reported goods, please report DuPont™ product sales revenue:

| DuPont™ Product | Purchase Price | Quantity Purchased | Total DuPont™ Sales Revenue |
|-----------------|----------------|--------------------|-----------------------------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Total | | | |

**Royalty Statement**
**Territory Detail**

Licensee Name:    ThorWorks Industries Inc.
Licensor Name:    DuPont™

Reporting Period: Q4: October 1 to December 31, 2005

TERRITORY:    United States – Other Sales Dupont

| SKU ID | SKU Description | Selling Price | Units | Gross Sales | Adjusted Amount | Net Sales | Royalty Rate | Royalty Due |
|--------|----------------|---------------|-------|-------------|-----------------|-----------|--------------|-------------|
| H6700 | 3.5 gallon driveway sealer | $7.00 | 170 | $1,190.00 | $ 1,654.60 - | $ 464.60 - | 4.00% | $ 18.58 - |
| H6300 | 1 gallon pourable crack filler | $5.69 | 0 | $ 0.00 | $ 0.00 | 0.00 | 4.00% | $ 0.00 |
| H6400 | 1 quart pourable crack filler | $2.84 | 0 | $ 0.00 | $ 0.00 | 0.00 | 4.00% | $ 0.00 |
| H6500 | 1 gallon trowel grade crack filler | $5.69 | 0 | $ 0.00 | $ 0.00 | 0.00 | 4.00% | $ 0.00 |
| H6600 | 1 quart oil spot primer | $2.84 | 0 | $ 0.00 | $ 0.00 | 0.00 | 4.00% | $ 0.00 |
| H6900 | 5 gallon driveway sealer | $7.00 | 0 | $ 0.00 | $ 0.00 | 0.00 | 4.00% | $ 0.00 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

If DuPont™ products were purchased as ingredients in the reported goods, please report DuPont™ product sales revenue:

| DuPont™ Product | Purchase Price | Quantity Purchased | Total DuPont™ Sales Revenue |
|-----------------|----------------|--------------------|-----------------------------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Total | | | |

Royalty Statement
Territory Detail

Reporting Period: Q4: October 1 to December 31, 2005

Licensee Name:    ThorWorks Industries Inc.
Licensor Name:    DuPont™

TERRITORY:    United States -- Sears Sales Dupont

| SKU ID | SKU Description | Selling Price | Units | Gross Sales | | Adjusted Amount | | Net Sales | | Royalty Rate | Royalty Due | |
|--------|-----------------|---------------|-------|------|------|------|------|------|------|------------|------|------|
| H6900 | 5 gallon driveway sealer H6900 | $13.58 | 0 | $ | 0.00 | $ | 0.00 | $ | 0.00 | 4.00% | $ | 0.00 |
| H6300 | 1 gallon pourable crack filler | $ 5.69 | 0 | $ | 0.00 | $ | 0.00 | $ | 0.00 | 4.00% | $ | 0.00 |
| H6400 | 1 quart pourable crack filler | $ 2.84 | 0 | $ | 0.00 | $ | 0.00 | $ | 0.00 | 4.00% | $ | 0.00 |
| H6500 | 1 gallon trowel grade crack filler | $ 5.69 | 0 | $ | 0.00 | $ | 0.00 | $ | 0.00 | 4.00% | $ | 0.00 |
| H6600 | 1 quart oil spot primer | $ 2.84 | 0 | $ | 0.00 | $ | 0.00 | $ | 0.00 | 4.00% | $ | 0.00 |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

If DuPont™ products were purchased as ingredients in the reported goods, please report DuPont™ product sales revenue:

| DuPont™ Product | Purchase Price | Quantity Purchased | Total DuPont™ Sales Revenue |
|-----------------|----------------|--------------------|-----------------------------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Total | | | |

**Royalty Statement**
**Territory Detail**

Reporting Period: Q4: October 1 to December 31, 2005

Licensee Name:  ThorWorks Industries Inc.
Licensor Name:  DuPont™

TERRITORY:   United States – Menards Sales Dupont

| SKU ID | SKU Description | Selling Price | Units | Gross Sales | Adjusted Amount | Net Sales | Royalty Rate | Royalty Due |
|--------|-----------------|---------------|-------|-------------|-----------------|-----------|--------------|-------------|
| H6700 | 3.5 gallon driveway sealer | $7.80 | 0 | $  0.00 | $  0.00 | $  0.00 | 4.00% | $  0.00 |
| H6300 | 1 gallon pourable crack filler | $3.24 | 0 | $  0.00 | $  0.00 | $  0.00 | 4.00% | $  0.00 |
| H6400 | 1 quart pourable crack filler | $1.35 | 0 | $  0.00 | $  0.00 | $  0.00 | 4.00% | $  0.00 |
| H6500 | 1 gallon trowel grade crack filler | $3.18 | 0 | $  0.00 | $  0.00 | $  0.00 | 4.00% | $  0.00 |
| H6600 | 1 quart oil spot primer | $1.53 | 0 | $  0.00 | $  58.65 - | $  58.65 - | 4.00% | $  2.35 - |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

If DuPont™ products were purchased as ingredients in the reported goods, please report DuPont™ product sales revenue:

| DuPont™ Product | Purchase Price | Quantity Purchased | Total DuPont™ Sales Revenue |
|-----------------|----------------|--------------------|-----------------------------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Total |  |  |  |

# EXHIBIT C

SO ORDERED **Filed:** Oct 4 2007 1:18P**EDT**
Transaction ID 16555270
Case No. 05C-06-327 BEN

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| DALE MARTIN, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 05C-06-327 RRC |
| | ) | |
| ACE HARDWARE CORPORATION | ) | |
| et al., ., | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER

On this _____ day of October, 2007, the Court having duly considered the

Defendant E. I. du Pont de Nemours and Company's Motion to Dismiss Without

Prejudice All Claims and Cross Claims and all Responses,

**IT IS HEREBY ORDERED** that the motion is **GRANTED** and all claims by the

Plaintiffs and any Co-Defendants against Defendant, E. I. du Pont de Nemours and

Company, are dismissed without prejudice.

_____
J.

1612701/1

**This document constitutes a ruling of the court and should be treated as such.**

| | |
|---|---|
| **Court:** | DE Superior Court-New Castle County |
| **Judge:** | Benzene Judge |
| **Alternate Judge:** | Unassigned |
| **File & Serve Transaction ID:** | 16462785 |
| **Current Date:** | Oct 04, 2007 |
| **Case Number:** | 05C-06-327 BEN |
| **Case Name:** | Martin, Dale vs Ace Hardware Corp |
| **Court Authorizer:** | Benzene Judge |

/s/ **Judge Benzene Judge**

EFiled:  May 16 2008 12:06PM EDT
Transaction ID 19862665
Case No. 08C-05-120 JEB

# EXHIBIT D

# EQUITY MANAGEMENT INC.

OFFICES IN:    SAN DIEGO  ·  DETROIT  ·  CHICAGO  ·  NEW YORK  ·  LONDON

SAN DIEGO OFFICE:
4365 EXECUTIVE DRIVE. SUITE 1000
SAN DIEGO, CA 92121
(858) 558-2500
FAX (858) 558-2507

May 7, 2008

<u>Via Federal Express</u>

Van H. Leichliter
IP Leader – Trademarks & Copyrights
Corporate Counsel
DuPont Legal
Barley Mill Plaza 25/2162
4417 Lancaster Pike
Wilmington, DE 19805

Re:    Thorworks Industries, Inc. v. E. I. DuPont de Nemours and Company, et. al.
       USDC, Northern District of Ohio, Case #3:08-cv-00948-JGC

Dear Mr. Leichliter:

Equity Management Inc. ("EMI") received a copy of the enclosed Complaint filed in the above-captioned matter. The Complaint asserts claims against EMI arising out of the Trademark License Agreement between the Plaintiff and DuPont. EMI's activities in connection with the subject license agreement were undertaken by EMI pursuant to, and in accordance with, the Representation Agreement between EMI and DuPont dated June 15, 2001. Accordingly, pursuant to Section 10(e) of the Representation Agreement, EMI is hereby requesting that DuPont assume EMI's defense of this case and assume all responsibility and costs, including all necessary and reasonable attorney's fees, associated with EMI's defense. EMI also requests that DuPont fully indemnify EMI against any and all claims, losses, and expenses associated with the above-captioned litigation.

Please confirm in writing that DuPont is assuming EMI's defense and will indemnify EMI. We request that DuPont respond to this tender of defense and indemnity in writing as soon as possible, but by no later than May 15, 2008.

In accordance with Section 10(f) of the Representation Agreement, we sent this letter to David J. Gould. However, this attempt was unsuccessful and it appears he is no longer with DuPont. Accordingly, we are sending this letter to your attention as you are the attorney with whom we most recently had contact.

If you have any questions in the meantime, please do not hesitate to contact me.

Sincerely,

Robin Stemen
Senior Vice President, Associate General Counsel

w/encl.

cc:    John T. Doyle, Esq.

# EXHIBIT E

EFiled: Mar 26 2008 10:21...M.EDT
Transaction ID 19142145
Case No. 08C-03-159 PLA

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| E. I. DU PONT DE NEMOURS AND COMPANY, a Delaware corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. |
| THORWORKS INDUSTRIES, INC., a Minnesota corporation, | ) ) ) | JURY TRIAL OF 12 DEMANDED |
| Defendant. | ) ) | |

## COMPLAINT

1.  Plaintiff is E. I. du Pont de Nemours and Company ("DuPont"), a Delaware corporation.

2.  Defendant is ThorWorks Industries, Inc., f/k/a Sealmaster Industries, Inc. ("ThorWorks"), a Minnesota corporation.

3.  This Court has jurisdiction over this matter based on Section 9 of the contract entitled DUPONT™ BRAND TRADEMARK LICENSE AGREEMENT ("License Agreement") dated May 17, 2004, between DuPont and ThorWorks. The parties agreed that any action arising out of the License Agreement shall be brought in the state or federal courts of the City of Wilmington, Delaware. ThorWorks agreed to submit to the jurisdiction of these courts, and the parties agreed that the contract was made and shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the choice of law or conflicts of law principles thereof. See Exhibit A, copy of DUPONT™BRAND TRADEMARK LICENSE AGREEMENT attached hereto.

4.    On July 13, 2005, Dale Martin ("Martin") filed a Complaint against 11 defendants, including E. I. du Pont de Nemours and Company ("DuPont"), alleging that he developed acute myelogenous leukemia as a result of exposure during his employment and in non-occupational endeavors to benzene or benzene-containing products, including sealers and adhesives manufactured by DuPont. See Exhibit B, copy of the Martin Complaint attached hereto.

5.    Subsequently, DuPont filed an answer to Plaintiffs Third Amended Complaint. See Exhibit C, copy of DuPont's Answer to Plaintiffs Third Amended Complaint attached hereto.

6.    After Plaintiff filed three amended complaints and following extensive discovery, Martin agreed to dismiss without prejudice and without consideration his claim against DuPont. See Exhibit D, a copy of Order [of Dismissal] entered October 4, 2007.

7.    By the terms of the License Agreement between ThorWorks and DuPont, ThorWorks agreed to indemnify, defend, and hold DuPont and EMI (Equity Management, Inc., the exclusive licensing agent for DuPont), and their officers, shareholders, employees, and agents,

> harmless from and against any and all claims, suits, obligations, causes of action, liabilities, costs, and damages (including without limitation reasonable attorney's fees and court costs, injuries to persons and damages to property, products liability claims, and claims for environmental harms) based upon, arising out of, or directly or indirectly related to, the operations or business conducted by ... [ThorWorks] under this or related to this Agreement (including without limitation the design, testing, manufacture, sale, distribution, marketing, use, display, advertising, or promotion of Products sold or promoted in connection with any of the Trademarks) ....

See Exhibit A, Section 11. These indemnity provisions are applicable to the claims asserted by Mr. Martin against DuPont in this action.

8.      DuPont tendered the defense of, and requested indemnity for, the Martin claim on or about October 29, 2006, to ThorWorks. See Exhibit E, copy of the demand letter attached hereto.

9.      In breach of its contractual obligations, ThorWorks has refused to defend or indemnify DuPont for the Martin claim.

10.     As a result of the breach of contract by ThorWorks, DuPont has incurred damages in an amount exceeding $116,600.00, and should be reimbursed that amount by ThorWorks.

WHEREFORE, DuPont prays that judgment be entered in its favor and against the Defendant, jointly and severally, in an amount sufficient to compensate it for its damages, plus the costs, including attorney's fees, of bringing this action.

MORRIS JAMES LLP

James W. Semple (#0396)
David J. Soldo (#4309)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800
Attorneys for Plaintiff

OF COUNSEL:
Andrew C. Schirrmeister III
SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP
Pennzoil Place-North Tower
700 Milam, 10th Floor
Houston, Texas 77459

Dated:  March 26, 2008

1718023

# EXHIBIT F

AO 440 (Rev. 08/06) Summons in a Civil Action

# United States District Court

## NORTHERN DISTRICT OF OHIO

### WESTERN DIVISION

THORWORKS INDUSTRIES, INC.

**SUMMONS IN A CIVIL CASE**

V.

E. I. DU PONT DE NEMOURS AND COMPANY

Case Number: 3:08CV948

and

EQUITY MANAGEMENT, INC.

Judge: Carr

Magistrate Judge:

TO: (Name and address of defendant)

E. I. DU PONT DE NEMOURS AND COMPANY
1007 Market Street
Wilmington, DE 19898

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

W. Patrick Murray
William H. Bartle
MURRAY & MURRAY CO., L.P.A.
111 E. Shoreline Drive
Sandusky, OH 44870

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

GERI M. SMITH
Clerk

DATE: April 14, 2008

s/ C. Malaikah
(By) Deputy Clerk

AO 440 (Rev. 8/06) Summons in a Civil Action

| RETURN OF SERVICE | | |
|---|---|---|
| | | DATE |
| Service of the Summons and Complaint was made by me [1] | | |
| Name of SERVER (PRINT) | | TITLE |

*Check one box below to indicate appropriate method of service*

☐     Served Personally upon the Defendant. Place where served:

☐     Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left:

☐     Returned unexecuted:

☐     Other *(specify):*

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL |

| DECLARATION OF SERVER |
|---|
| I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct. |

Executed on:
( *Date*   )

_____
*Signature of Server*


*Address of Server*

(1)    As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **THORWORKS INDUSTRIES, INC.**<br>2520 South Campbell Street<br>Sandusky, OH  44870 | ) ) ) | |
| Plaintiff, | ) ) | CASE NO. |
| -vs- | ) ) | JUDGE |
| **E. I. DU PONT DE NEMOURS<br>  AND COMPANY**<br>1007 Market Street<br>Wilmington, DE   19898 | ) ) ) ) | **C O M P L A I N T**<br><br>(Jury Demand Endorsed Hereon) |
| and | ) ) | |
| **EQUITY MANAGEMENT, INC.**<br>4365 Executive Drive, Suite 1000<br>San Diego, CA  92121 | ) ) ) | |
| Defendants. | ) ) | |

Plaintiff, by its undersigned attorneys, alleges upon personal knowledge as to itself and its own acts, and upon information and as to all other matters, as follows:

### JURISDICTION AND VENUE

1.    This case exceeds Seventy-Five Thousand Dollars ($75,000) and involves two companies in interstate commerce.  E.I. du pont de Nemours and Company ("DuPont") is a Delaware corporation and Equity Management, Inc. is a California

corporation. The plaintiff is an Ohio corporation. Jurisdiction is proper pursuant to 28 U.S.C. §1332.

### FIRST CAUSE OF ACTION

1.      Plaintiff alleges that on or about June 4, 2004, SealMaster Industries, Inc. ("ThorWorks") entered into a written contract, which was negotiated and signed in Erie County, Ohio, with the defendant, DuPont. A copy of said contract is attached hereto and marked **Exhibit 1**. Venue is proper pursuant to 28 U.S.C. §1391.

2.      Plaintiff alleges that, pursuant to the contract (plaintiff's **Exhibit 1**), it paid the defendant approximately Four Hundred Eighty-Five Thousand Dollars ($485,000). The payments were made pursuant to a contractual clause which required quarterly minimum royalties. The payments were required regardless of actual sales.

3.      In exchange for the said payments, the defendant, DuPont, promised the plaintiff that it would do the following:

> (a)    The plaintiff would be permitted to manufacture, design and sell its sealant product using the DuPont name;
>
> (b)    DuPont would use its skill and marketing powers to assist the plaintiff in selling its product to major national accounts such as Lowe's; and
>
> (c)    It would assist the plaintiff in all aspects of marketing the specially designed and manufactured sealant.

4.      The defendant breached its contract with the plaintiff by doing the following:

> (a)    It failed to use its skill and influence in assisting the plaintiff to obtain any national accounts;

(b)    It provided the plaintiff with no appreciable assistance in marketing the said product;

(c)    It repeatedly engaged in a course of conduct which interfered with the plaintiff properly marketing the product;

(d)    It failed to attend sales meetings wherein the subject matter was the sale of said product;

(e)    It collected minimum payments while failing to properly assist plaintiff in marketing a product which bore DuPont's name.

5.    Plaintiff alleges that Equity Management, Inc. was a company hired by DuPont for the purposes of making sales presentations to manufacturers who had well-established products. DuPont hired its services to sell the idea that smaller companies should re-label their products with DuPont's name so that they could gain the commercial advantage of national name recognition and the marketing power which DuPont could bring to bear. Defendant, Equity Management, Inc. negligently misrepresented the nature and extent of services DuPont would provide to the plaintiff after a contractual relationship was created. It failed to disclose to the plaintiff that DuPont would take unearned minimal payments without providing any services.

## SECOND CAUSE OF ACTION

6.    Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

7.    Plaintiff alleges that the defendant, DuPont, was sued by a plaintiff who claimed that the plaintiff's DuPont product caused him to suffer cancer. The case was dismissed on the pleadings after ThorWorks pointed out that its product did not contain the alleged carcinogen.

3

8.     Plaintiff alleges that the defendant, DuPont, has requested it to pay Ninety Thousand Dollars ($90,000) for the cost of defense.  Plaintiff alleges that it was never timely advised of the lawsuit until after the substantial legal bill was created for services which were provided to DuPont without its knowledge or consent.  Plaintiff had the contractual right to defend any lawsuit which involved its product.  DuPont failed to timely notify plaintiff of the lawsuit until after large sums of money were unnecessarily expended in defense of the said product.  DuPont volunteered to defend the lawsuit at great and unnecessary expense.

9.     Plaintiff alleges that it was fully insured and if it had been timely advised of the lawsuit, its insurance company would have handled it without cost to it. Furthermore, the plaintiff would have provided information that would have caused the dismissal of the lawsuit with virtually no expense.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that any claim for attorney fees be disallowed. Plaintiff further demands judgment against defendants in the sum of Four Hundred Eighty-Five Thousand Dollars ($485,000), the costs of this action and any and all other relief to which it is entitled to, including litigation expenses and attorney fees in connection with bringing this action, and such other relief as the Court may deem just and proper.

## JURY DEMAND

With the filing of this complaint, plaintiff hereby demands a trial by jury.

W. Patrick Murray (Reg. No. 000 8841)
wpm@murrayandmurray.com
Direct Dial:  (419) 624-3122
William H. Bartle (Reg. No.  000 8795)
whb@murrayandmurray.com
Direct Dial:  (419) 624-3012
MURRAY & MURRAY CO., L.P.A.
111 E. Shoreline Drive
Sandusky, OH  44870
FAX:  (419) 624-0707

Attorneys for Plaintiff

# DUPONT™ BRAND
## TRADEMARK LICENSE AGREEMENT

THIS AGREEMENT made this 17 ™ day of May, 2004, ("Effective Date") between E. I. DU PONT DE NEMOURS AND COMPANY, a corporation of the State of Delaware, U.S.A., with its principal place of business at 1007 Market Street, Wilmington, Delaware 19898, U.S.A. ("DUPONT"), and SEALMASTER INDUSTRIES, INC., a corporation organized and existing under the laws of the State of Minnesota U.S.A., with its principal place of business at 2520 South Campbell Street, Sandusky, Ohio 44870 ("LICENSEE").

WITNESSETH:

WHEREAS, DUPONT is the owner of the DuPont™ Brand Trademarks set forth in Exhibit A, (hereinafter referred to as "Trademarks").

WHEREAS, LICENSEE desires a license under the Trademarks, and DUPONT is willing to grant the same upon the terms and conditions hereinafter recited; and

WHEREAS, EQUITY MANAGEMENT, INC., ("EMI") is the exclusive licensing agent for DUPONT for certain matters regarding this Agreement.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties herein, DUPONT and LICENSEE agree as follows:

1.  GRANTS: DUPONT hereby grants to LICENSEE a nontransferable, nonassignable, revocable, exclusive right, without the right to sublicense, to use the Trademarks, solely and only in the Territory, Field of Use, and Distribution Channels set forth in Exhibit A, on and in connection with the display, advertising, promotion, labeling, sale, marketing, and distribution of Products set forth in Exhibit A. Notwithstanding anything to the contrary herein, the license granted herein is subject to the right of DUPONT to use the DuPont™ Brand Trademarks to identify ingredients in Products and other products.

a)  Limited License: Nothing in this Agreement shall be construed to grant LICENSEE any rights or license to any trademark, trade name, certification mark, service mark, domain name, product name, logo, patent, technical information, or copyright of DUPONT other than as specified herein. All rights not specifically granted to LICENSEE are reserved to DUPONT.

Use: DUPONT reserves the right as owner of the Trademark to specify all aspects of use of the Trademark, including but not limited to, the manner, place, type, form, layout, design, channels of trade, channels of distribution, and media of or for such use, on or in connection with, all displays, advertising, labels, Products literature, Internet sites, sales promotion materials, and all other forms of use of the Trademarks. All use of the licensed Trademarks shall inure to the benefit of DUPONT. LICENSEE shall comply with any specific trademark use rules as may be referenced in any of the Exhibits, or provided to LICENSEE, which may be amended or revised by DUPONT from time to time, upon written notice

Except as expressly permitted herein or except in accordance with DUPONT's prior written approval, no other trademarks, trade names, corporate names, certification marks, service marks, product names, logos, brands, domain names or identifiers are permitted to be used with the Products.

1

PLAINTIFF'S
EXHIBIT
1
ALL-STATE® INTERNATIONAL

b) <u>Acknowledgment:</u> LICENSEE hereby acknowledges the validity of DUPONT's Trademarks and DUPONT's exclusive right, title and interest in and to the Trademarks. LICENSEE shall not, during the term of this Agreement, or thereafter: 1) do or permit to be done any act or thing which prejudices, infringes or impairs the rights of DUPONT with respect to the Trademarks; 2) except for the limited license granted hereunder, will never represent that it has any right, title, or interest in or to the Trademarks or in any registration for them; 3) shall not use, register or attempt to register any Trademarks, trade names, logos, domain names, electronic mail (e-mail) addresses, or server names that are identical to, or confusingly similar to the Trademarks or any other Trademarks, trade names or domain names of DUPONT or any of its subsidiaries or affiliated companies; 4) shall not do anything or produce any goods in connection with the Trademarks that damages or reflects adversely upon DUPONT, its subsidiaries or affiliated companies or any of their Trademarks, trade names or domain names; 5) upon objection by DUPONT, shall forthwith desist from any use or action in relation to or in connection with the Trademarks or this Agreement that do not meet reasonable trademark use or licensing practices or standards, do not meet DUPONT's then current Trademark Use Rules (Exhibit B) or Identity Standards, or do not comply with previously approved Copy (see Section 6); and 6) when requested by DUPONT, shall employ identifying symbols and/or words in connection with its use of the Trademarks. LICENSEE shall cooperate with DUPONT in taking all appropriate measures for the protection of the Trademarks, and shall faithfully observe and execute the requirements, procedures, and directions of DUPONT with respect to the use and protection of the Trademarks.

c) <u>Goodwill:</u> LICENSEE recognizes the value of the reputation and goodwill associated with the Trademarks, acknowledges that the Trademarks and any marks confusingly similar to the Trademarks have acquired secondary meaning, and that all related rights and goodwill belong exclusively to DUPONT.

d) <u>Art Work:</u> All art, design, and layout work (hereinafter, collectively, "Art Work") that contains, is derived from, or used with the Trademarks, but excluding the Trademarks per se, will be owned by the party developing it. LICENSEE shall not obtain, attempt to obtain. or claim any trademark or copyright rights with respect to any Trademarks included in the Art Work, and upon request, LICENSEE shall assign copyright rights in or to the Trademarks to DUPONT.

e) <u>Notification of Infringement:</u> LICENSEE shall notify DUPONT in writing of any manufacture, distribution, sale or advertisement of any product or service that may constitute an infringement upon DUPONT's rights or LICENSEE's authorized use of the Trademarks. LICENSEE shall not commence, prosecute or institute any action or proceeding against any person, firm, or entity alleging infringement, imitation, or unauthorized use of the Trademarks.

f) <u>Infringement Action:</u> DUPONT shall have the sole right to determine the appropriate action to be taken with respect to any infringement, imitation, or unauthorized use of the Trademarks including having the sole discretion to settle any claims or any controversy arising therefrom. LICENSEE shall provide DUPONT with such reasonable assistance as DUPONT may require in obtaining any protection of DUPONT's rights to the Trademarks at no expense to DUPONT. LICENSEE shall not have any rights or claim against DUPONT for damages or otherwise arising from any determination by DUPONT to act or not to act with respect to any alleged infringement, imitation or unauthorized use by others, and any such determination by DUPONT shall not affect the validity or enforceability of this Agreement. Any and all damages and settlements recovered arising from any action or proceeding shall belong solely and exclusively to DUPONT.

g) <u>Assignment to DUPONT:</u> Upon request, LICENSEE shall transfer to DUPONT any rights which accrue to LICENSEE arising from its use of the Trademarks or this Agreement.

2. ROYALTY: Any applicable royalties hereunder are set forth in Exhibit A.

3. QUALITY STANDARDS, INSPECTION, AND TESTING:   So that the value of the goodwill and reputation associated with the Trademarks will not be diminished, LICENSEE will ensure that all Products sold using the Trademarks are manufactured in compliance with and meet all applicable governmental and industry laws, rules, regulations, standards, guidelines, and the like, including but not limited to, those related to fitness of use and safety for human use, and these established by the Environmental Protection Agency, the National Science Foundation, and Underwriter's Laboratories. LICENSEE shall also manufacture the Products in accordance with LICENSEE's Quality Standard (ISO9002) as approved by DUPONT. The Products will be equal to and preferably superior to, the quality that a consumer would reasonably expect of products and are similar in type, nature, and price.

To monitor for LICENSEE's adherence to such obligations, DUPONT shall have the right, from time to time through duly authorized representatives, to inspect and test such Products at DUPONT's own expense. Licensed Products not meeting the quality or other requirements of this Agreement shall not be sold or in any way promoted in connection with the Trademarks, and all references to the Trademarks on labels, product literature, packaging, hang tags, promotional material, etc., shall be removed or obliterated at LICENSEE'S expense.

LICENSEE shall be responsible for ensuring that any manufacturer of Products and ingredients therefore, for or on behalf of the LICENSEE, shall meet the quality and other requirements of this Agreement.

If at any time LICENSEE desires to upgrade, modify, supplement, or change any aspect of the Products or the quality standards for the Products (hereinafter, collectively, "Proposed Changed Products"), LICENSEE will submit notice of the Proposed Changed Products to DUPONT with at least thirty (30) days advance written notice and concurrent oral notice. Within thirty (30) days of the receipt of notice of any Proposed Changed Product, DUPONT will notify LICENSEE of DUPONT's decision regarding such Proposed Changed Products. All Proposed Changed Products must be approved by DUPONT in writing before release; such approval may be granted or withheld in DUPONT's sole discretion. If DUPONT rejects any Proposed Changed Products, thereafter, if the parties mutually desire, they will confer to attempt to reach agreement regarding an acceptable Proposed Changed Products, provided, however, that DUPONT will have sole discretion regarding whether or not to reject or accept any such Proposed Changed Products. Notwithstanding anything to the contrary herein, if DUPONT does not approve within 30 days, it shall be deemed not approved.

Before selling or distributing any initial Products or accepted Proposed Changed Products, LICENSEE shall furnish DUPONT and EMI, at no charge, for its use, six (6) samples of Products from the first production run. If such samples do not conform to all aspects of the Products as required herein, then DUPONT shall notify LICENSEE and all such Products shall be deemed to be disapproved, and all such Products shall be promptly disposed of as required herein above in this Section 3. LICENSEE shall also furnish DUPONT, free of charge, with any additional samples of Products as may reasonably be required by DUPONT to promote the sale of Products (e.g., advertisements, publicity photos, product placement and trade shows) or for comparison with earlier samples.

4. OTHER REQUIREMENTS:

a)  Unless otherwise agreed in writing by DUPONT , the Trademarks will be used as the primary brands for the Products.

b) Competitive product will not be used in any Products that would be detrimental to DUPONT.

c) Products will bear the following notice: "Manufactured and Distributed By: In case of questions, problems, or emergencies, please contact [INSERT COMPANY NAME, 800 PHONE NUMBER, AND E-MAIL ADDRESS], who assumes liability for the manufacture for this Product.

5. PRODUCT STEWARDSHIP:

a) Prior to the shipment of Product and before any product is sold bearing the Trademarks, LICENSEE shall provide information to DUPONT to assist DUPONT in determining that LICENSEE has adequate systems in place to exercise appropriate product stewardship for all Products so as to assure that the Products will be reasonably safe for users and handlers and for the environment. LICENSEE shall provide information to demonstrate that its product stewardship systems fulfill all of the principles of Industry Product Stewardship as set forth in Exhibit C to this Agreement. [Product Stewardship Responsible Care® Code of Management Practices].

b) LICENSEE shall cooperate with DUPONT's review of LICENSEE's product stewardship systems for Products bearing the Trademarks, including, but not limited to the following requirements:

(1) At any time prior to or after execution of the Agreement, LICENSEE shall provide accurate and complete information requested by DUPONT that is deemed necessary to determine LICENSEE's conformance to the standards set forth in Exhibit C. Such information shall include, but shall not necessarily be limited to, all applicable information requested in DUPONT's Protocol for Assessing the Stewardship Systems of Potential Licensees of the Trademarks, attached hereto as Exhibit D; and

(2) LICENSEE shall have an affirmative responsibility to notify and provide all relevant information to DUPONT on a continuing basis regarding any significant change in composition, proposed uses, and applications of Products and countries to which Products will be distributed (or any other change relating to Products relevant to product stewardship).

c) LICENSEE's failure, 1) to conform to the product stewardship principles herein or 2) to provide the information necessary for DUPONT to perform the applicable audit for Product Stewardship valuation as determined by DUPONT, shall entitle DUPONT to terminate this Agreement in accordance with, in its sole judgment, the provisions of Section 8(a) below.

d) LICENSEE hereby acknowledges the following:

(1) That the requirements of this section are intended to assist DUPONT as licensor of the trademarks in selecting licensees who will use adequate product stewardship as required herein with respect to the Products. These requirements do not and are expressly not intended to substitute DUPONT as the product steward for the Products.

(2) That as the manufacturer of the Products, LICENSEE is in the best position to exercise effective product stewardship with regard to its Products, its customers and other product users, its employees, contractors, distributors, and suppliers.

(3) That LICENSEE shall be responsible for the product stewardship of all Products.

(4)     That regarding subsection b) (2) of this Section 5, LICENSEE is responsible for determining whether or not any change is a "significant change" that requires LICENSEE to notify DUPONT and provide all relevant information.

(5)     While DUPONT may, on occasion, on a gratuitous basis provide suggestions regarding elements of good stewardship systems, nevertheless, LICENSEE, in meeting its product stewardship obligations, shall rely on its own stewardship systems, resources and personnel and not upon the systems, resources and personnel of DUPONT.

6.  LICENSING NOTICE:  LICENSEE shall include a notice on all labeling, packaging, hang tags, advertising, Products literature, Internet sites, sales, and promotional material that the Trademarks are licensed from DUPONT.  The notice shall be as follows or as otherwise specified in writing by DUPONT:

> "The DuPont Oval logo, DuPont™, The miracles of science™, and Teflon® are registered trademarks or trademarks of DuPont and are used under license by SealMaster Industries, Inc."

LICENSEE shall submit to DUPONT, with a copy to EMI, prior to use, copies of all proposed original and revised promotional materials, advertisements, Internet web pages, labels, packaging, hang tags, and other materials displaying or bearing the Trademarks (hereinafter collectively referred to as "Copy").  Concurrent oral notice of same shall also be provided to DUPONT and EMI.  Within fifteen (15) days of receipt of such Copy, DUPONT will approve or reject same; if DUPONT fails to respond within fifteen (15) days, then the Copy will be deemed to be rejected.  If DUPONT rejects such Copy, then LICENSEE will modify such Copy as required by DUPONT.

LICENSEE shall comply with the Trademark Use Rules set forth in Exhibit B and the then current Identity Standards of DUPONT.

DUPONT may modify the Trademark Use Rules upon thirty (30) days prior written notice to LICENSEE.

5

7. **NOTICES:** Notices hereunder will be provided as follows:

For DUPONT:

    a)   E. I. du Pont de Nemours and Company
         DuPont Corporate Public Affairs
         1007 Market Street, D-11040
         Wilmington, DE 19898
         U.S.A.
         Telephone: (302) 774-0187
         Facsimile: (302) 773-2919
         Attention: Lynne Chappel, DuPont Licensing Brand Manager
         E-Mail: lynne.chappel@usa.dupont.com

    b)   E. I. du Pont de Nemours and Company
         DuPont Legal
         Trademark Group
         1007 Market Street, D-4058-1
         Wilmington, DE 19898
         U.S.A.
         Telephone: (302) 774-7305
         Facsimile (302) 773-0461
         Attention: David J. Gould, Corporate Trademark Counsel
         E-Mail: david.j.gould@usa.dupont.com

For EQUITY MANAGEMENT, INC.

         Equity Management, Inc.
         4365 Executive Drive, Suite 1000
         San Diego, CA 92121
         U.S.A
         Telephone: (858) 558-2500
         Facsimile: (858) 558-2507
         Attention: Mr. Glen Konkle, President
         E-Mail: gkonkle@equitymanagementinc.com

For LICENSEE:

         SealMaster Industries, Inc.
         2520 South Campbell Street
         Sandusky, OH 44870
         U.S.A
         Telephone: (419) 626-4375
         Facsimile: (419) 626-5477
         E-Mail: rick@sealmaster.com
         Attention: Rick Noon

8. **TERM AND TERMINATION:** Unless terminated or cancelled as provided herein this Agreement shall become effective upon the Effective Date and shall continue in full force and effect through December 31, 2009. In the event of termination or cancellation, neither party shall be liable for any

loss, expense, liability, termination compensation, or payments of any kind, including, but not limited to any investment, promotion or selling expense. Notwithstanding the foregoing, LICENSEE shall have the option to terminate this Agreement without cause at the end of Contract Year 3 provided the Running Royalties generated during Contract Year 3 do not equal or exceed LICENSEE's Guaranteed Royalty obligation for the same Contract Year outlined in Exhibit A. In the event LICENSEE exercises its option under this provision, LICENSEE shall pay to DUPONT the Guaranteed Royalties for Contract Year 1-3, if not already paid, and Guaranteed Royalties for Contract Years 4 and 5 shall be waived.

a) Termination by Default: If in DUPONT's sole discretion:

    (1) LICENSEE is failing to comply fully with the terms of this Agreement, as agreed; or

    (2) LICENSEE is using the Trademarks on Products that: (i) are defective or unsuitable in any way; (ii) reflect adversely on DUPONT or the Trademarks; or (iii) otherwise fail to meet the quality control standards of DUPONT or such standards have not been submitted to DUPONT as may be required herein;

then DUPONT shall at its sole discretion so advise LICENSEE of its breach of this Agreement by written notice and LICENSEE shall cease and correct the objectionable practices immediately upon receipt of DUPONT's notice. If such objectionable practice is not corrected within thirty (30) days of such notice, then DUPONT shall have the right to terminate this Agreement at any time thereafter upon written notice or DUPONT may require that LICENSEE suspend the use of the Trademarks in connection with any Products affected until DUPONT advises LICENSEE that it may resume use of the Trademarks under such conditions as DUPONT may determine. In addition, if DUPONT so requests, LICENSEE shall remove or obliterate the Trademarks, at LICENSEE's expense, from all affected Products in possession of LICENSEE's customers or their customers. If removal or obliteration of the affected Trademarks are impossible or impracticable, LICENSEE shall provide written notification to all of the LICENSEE's customers that the Products in question should not have been identified with or promoted in connect with the Trademarks. Notwithstanding anything to the contrary herein, if LICENSEE discontinues sale of Products, then this Agreement shall be automatically terminated.

b) Cancellation: This Agreement may be immediately canceled by DUPONT, at its sole discretion, upon written notice to LICENSEE to that effect, should any of the following occur: 1) if a petition in bankruptcy is filed, a judgment is entered against LICENSEE or if LICENSEE is adjudged a bankrupt; 2) if LICENSEE takes advantage of any insolvency act or debtor's relief act; 3) if LICENSEE makes an assignment for the benefit of its creditors; 4) if at any time DUPONT is concerned about the financial condition of the LICENSEE; 5) if any of its Products are recalled for any reason and LICENSEE refuses or fails to correct the condition or defect that caused the recall; 6) if the business or assets of LICENSEE, or any portion thereof, are or are threatened to be seized, nationalized, confiscated or expropriated; or 7) if, without DUPONT's prior, written approval, a majority of the capital stock or shares or other controlling interest in LICENSEE should be sold or a contract made for the sale thereof, or if ownership or control of LICENSEE's business shall otherwise change, or if LICENSEE shall acquire a majority interest in a company competing with DUPONT.

c)  Disposal of Stock:  For a period of ninety (90) days following the expiration (but not after the cancellation or termination) of this Agreement, LICENSEE may sell-off and deliver Product that is on hand at time of such expiration ("Sell-Off"). Such Product may only be sold in accordance with this Agreement and in the normal course of business and at normal selling prices. All payments and reports with respect to the Sell-Off will be made in accordance with this Agreement. DUPONT will have the right to conduct inspections of inventories prior to and during the Sell-Off upon prior written notice. Except as otherwise permitted for such Sell-Off, after expiration or termination of this Agreement, LICENSEE shall have no further right to use the Trademarks or manufacture, authorize any third party to manufacture, distribute, sell, promote or otherwise deal in any Products or products that use the Trademarks.

d)  Renewal:  Ninety days prior to the expiration of this Agreement, LICENSEE shall have the option by written notice to DUPONT to renew this Agreement for an additional five (5) contract years from the date of expiration of the Term, provided this Agreement has not been terminated in accordance with the provisions set forth and LICENSEE shall have paid DUPONT a minimum of $375,000.00 in earned royalties for the period defined as the last six (6) months of Contract Year 4 plus the first six (6) months of Contract Year 5. Upon renewal, Minimum Royalties will be due for the second 5 year period as defined in Exhibit A.

9.  CHOICE OF LAW:  This Agreement is acknowledged to have been made in and shall be governed by and construed in accordance with the laws of the State of Delaware, United States of America, without regard to the choice of law or conflicts of law principles thereof. Any actions under this Agreement shall be brought only in the state or federal courts in the City of Wilmington, Delaware, United States of America. LICENSEE hereby submits to the jurisdiction of such courts.

10.  NO CONSEQUENTIAL DAMAGES:  In no event shall either party be liable for any special, indirect, incidental, punitive, consequential, or any similar damages whether or not caused by or resulting from the negligence of such party even if such party has been advised of the possibility of such damages, in relation to, arising out of or in connection with this Agreement or the Trademarks.

11.  INDEMNITY:

(a) DUPONT and EMI assume no liability to LICENSEE or any third parties with respect to the performance characteristics of the Products manufactured, sold, or distributed by LICENSEE. LICENSEE hereby indemnifies, defends, and holds DUPONT, EMI, and their officers, shareholders, employees, and agents, harmless from and against any and all claims, suits, obligations, causes of action, liabilities, costs, and damages (including without limitation reasonable attorney's fees and court costs, injuries to persons and damages to property, products liability claims, and claims for environmental harms) based upon, arising out of, or directly or indirectly related to, the operations or business conducted by LICENSEE under this or related to this Agreement (including without limitation the design, testing, manufacture, sale, distribution, marketing, use, display, advertising, or promotion of Products sold or promoted in connection with any of the Trademarks); provided, however, that such indemnity shall not apply to the extent of problems related to DUPONT's supply of ingredients not meeting specifications. Said indemnity shall further extend to LICENSEE's performance or nonperformance under this Agreement, including any default on the part of LICENSEE, whether or not any such violation or failure to comply has been disclosed to DUPONT. This indemnity and all representations and warranties made by the Parties herein or in any instrument or document furnished in connection herewith shall survive termination of the Agreement. LICENSEE will be promptly informed of claims.

8

(b) LICENSOR hereby indemnifies, defends, and holds LICENSEE harmless from and against any and all claims, suits, obligations, causes of action, liabilities, costs, and damages (including without limitation reasonable attorney's fees and court costs, injuries to persons and damages to property, products liability claims, and claims for environmental harms) based upon, arising out of, or directly or indirectly related to any claim of infringement or dilution of the Trademarks provided the Trademarks are used as required by this Agreement. This indemnity and all representations and warranties made by the Parties herein or in any instrument or document furnished in connection herewith shall survive termination of this Agreement.

12. INSURANCE: LICENSEE shall obtain and maintain at its sole cost and expense throughout the Term and renewal of this Agreement, and for a period of five (5) years following the termination or expiration of this Agreement, commercial general liability insurance (including product liability, advertiser's and contractual liability coverage) on an occurrence based policy form in the minimum amount of ten million dollars ($10,000,000.00) combined single limit for personal injury and property damage (on a per occurrence basis) and a deductible not to exceed five hundred thousand dollars ($500,000) to cover LICENSEE's obligations under this Agreement. Such insurance shall be underwritten by an insurance company with a Best's rating of at least A-/XII and licensed to do business in the Territory. DUPONT and EMI shall be named as additional insureds on such insurance. Insurance policies shall not contain cross-claim, cross-suit, or other such exclusion clauses which would preclude additional insured parties from instituting causes of action against other insureds under the policy or which would otherwise limit coverage of additional insureds. Certificates of insurance in a form reasonably acceptable to DUPONT evidencing the insurance coverage so required shall be sent to DUPONT and EMI at the addresses set forth herein above, prior to the effective date of this Agreement. Such certificates shall provide that the insurer will give DUPONT and EMI not less than thirty (30) days advance written notice of any change in or cancellation of coverage.

13. CONFIDENTIALITY: It is anticipated that each Party ("Receiving Party") will obtain information about the other Party's business and technology that the other Party ("Disclosing Party") considers to be confidential. In order to promote the free exchange of information, each Party agrees to maintain the information that it receives from the other Party in confidence and not disclose it to any third party for three (3) years after the expiration, termination or cancellation of this Agreement, provided that, in the case of oral or visual disclosure, such information shall be identified in writing as confidential within thirty (30) days of the oral or visual disclosure. This obligation of secrecy, however, shall not apply to information which:

a) is known to the public at the time of its disclosure, or becomes known to the public after the disclosure through no fault of the Receiving Party;

b) the Receiving Party can show was in its possession after the time of the disclosure, from a third party not under an obligation of secrecy to the Disclosing Party;

c) the Receiving Party can show was developed by, or for, the Receiving Party independent of the disclosure by the Disclosing Party;

d) is necessarily disclosed to a third party pursuant to the commercial sale of Products; or,

9

e)  is required to be disclosed by law

Notwithstanding the foregoing provisions, the Parties recognize that each Party will be obtaining information about the other Party's business which the Receiving Party knows or should know is considered to be confidential by the Disclosing Party even though that information is not susceptible to written identification as confidential. Each Party shall treat such information with the same degree of care that it treats its own information of a similar nature.

14.  ASSIGNMENT:  This Agreement may be assigned by DUPONT upon sixty (60) days advance written notice. Neither this Agreement nor the rights or obligations herein can be assigned by LICENSEE, in whole or in part, without the prior written consent of DUPONT

15.  DISCLAIMER:  Notwithstanding any other provision of this Agreement to the contrary:  ALL LICENSES IN THIS AGREEMENT, INCLUDING WITH RESPECT TO ALL TRADEMARKS AND DOMAIN NAMES, ARE BEING MADE WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY NATURE,

   a)  AS TO THEIR VALUE OR FREEDOM FROM ENCUMBRANCE,

   b)  AS TO ANY WARRANTY (EXPRESS OR IMPLIED, ORAL OR WRITTEN) OF TITLE, PURPOSE (WHETHER OR NOT A PARTY OR ITS AFFILIATES KNOWS OR HAS REASON TO KNOW ANY SUCH PURPOSE), OR ANY OTHER MATTER, INCLUDING THE COMPLETENESS OR SUFFICIENCY OF THE TRADEMARKS AND DOMAIN NAMES LICENSED HEREUNDER WHETHER ALLEGED TO ARISE BY LAW, BY REASON OF CUSTOM OR USAGE IN THE TRADE, BY COURSE OF DEALING OR OTHERWISE; OR

   c)  AS TO THE LEGAL SUFFICIENCY TO GRANT ANY RIGHTS THEREIN.

LICENSOR and LICENSEE hereby acknowledge and agree that ALL LICENSES IN THIS AGREEMENT, INCLUDING WITH RESPECT TO ALL TRADEMARKS AND DOMAIN NAMES, ARE BEING GRANTED "AS IS, WHERE IS."

16.  SURVIVAL:  Notwithstanding termination, cancellation, or expiration of this Agreement (collectively "Termination"), all provisions of this Agreement, to the extent necessary to interpret the rights and obligations of the Parties prior to such Termination, and/or enforce same and to Sell-Off remaining inventory as may be permitted herein, shall survive Termination.

17. **COMPLETE CONTRACT:** This Agreement and its exhibits contain the entire contract and understanding between the parties regarding the subject matter herein. There are no representations or understandings, oral or written, express or implied, that are not merged herein. This Agreement may not be modified or terminated orally. No alleged modification, termination, or waiver shall be binding unless it is set out in writing and signed by the party against which it is sought to be enforced; and all prior agreements and/or understandings oral or written. express or implied, between the parties with respect to the subject matter hereof are hereby terminated

IN WITNESS WHEREOF, the parties have executed this Agreement in duplicate by their duly authorized representatives as of the day and year first above written.

Approved by: _____
Lynne Chappel
DuPont™ Licensing Brand Manager
DuPont Public Affairs
E. I. DU PONT DE NEMOURS AND COMPANY

Approved by:
Print Name: _____
Scott F. Nelson
Global Manager for the DuPont™ Brand
E. I. DU PONT DE NEMOURS AND COMPANY

LICENSOR:                                    LICENSEE:

E. I. DU PONT DE NEMOURS AND COMPANY
Wilmington, Delaware, U.S.A.

By: _____ By: _____
Printed Name: _____ Printed Name: _____ David Thorson
Title: _____ Assistant Secretary    Title: ____ President
DuPont Legal Trademark Attorney Initials: _____

By: _____
Printed Name: _____
Title: _____
DuPont Legal Trademark Attorney Initials: _____

EXHIBIT A

1. DEFINITIONS:

"Trademarks" shall mean: The DuPont Oval trademark, the DuPont™ straightline trademark, and The miracles of science™ trademark (collectively, the "DuPont Brand Trademarks")

"Territory" shall mean the United States, its possessions and territories, and Canada.

"Field of Use" shall mean Do-It-Yourself sealants and coatings limited to driveway, roofing and foundation products.

"Distribution Channels" shall mean mass merchandise stores, hardware stores, direct mail, home centers, lumberyards and specialty stores including SealMaster Franchise Stores.

"Products" shall mean:
Category I         Polymer-modified driveway sealant and crack filler
Category II        Acrylic, cold-water based roof sealers and asphalt-based roof sealers
Category III       Acrylic, water-based foundation sealers and asphalt-based foundation sealers

All of such Products shall exhibit premium performance and shall be positioned as LICENSEE's premium offering for these Categories. It is understood that LICENSEE can offer, under other brands, driveway, roofing, and foundation products that do not have premium performance.

Selling Price means: With respect to any quantity of Products subject to royalty under this Agreement that is sold by LICENSEE (or any affiliate of LICENSEE licensed by DUPONT) to any third party, Selling Price shall be the gross sales price for that quantity, less any discounts and allowances to customers and commissions paid to distributors and other sales agencies, that are included in its gross sales price.

No deduction from the gross sales price shall be made for any item of cost incurred by the seller in its own operations incident to the manufacture, sale, or shipment of the product sold. Affiliate means: (1) any corporation owning or directly or indirectly controlling at least fifty percent (50%) of the stock normally entitled to vote for election of directors of a party and (2) any corporation owned or directly or indirectly controlled by a party, or by a corporation defined by item (1) of this sentence, through ownership of at least fifty percent (50%) of stock normally entitled to vote for election of directors. Such royalty shall be a fixed, absolute obligation of LICENSEE and is not subject to refund, recovery, or adjustment in any manner whatsoever, notwithstanding any election by DUPONT to terminate the Agreement.

2. ROYALTIES, PAYMENTS, REPORTS, AND RECORDS:

a) Royalties, Annual Minimum Payments, and Advance Payment:

(1) Royalties: In consideration of the rights granted hereunder, LICENSEE will pay DUPONT a royalty rate of four percent (4%) of the Selling Price. Such percentage royalties are based on the Selling Price of all quantities of Products sold with, in conjunction with, in association with, using, or using the benefit of the Trademarks.

(2) Annual Minimum Payments: Will be as follows:

| Annual Period | Start Date | End Date | % Royalty | Minimum Guarantee |
|---|---|---|---|---|
| Year 1 | 01/01/04 | 12/31/05 | 4% | $200,000 |
| Year 2 | 01/01/06 | 12/31/06 | 4% | $250,000 |
| Year 3 | 01/01/07 | 12/31/07 | 4% | $300,000 |
| Year 4 | 01/01/08 | 12/31/08 | 4% | $350,000 |
| Year 5 | 01/01/09 | 12/31/09 | 4% | $400,000 |

| Annual Period | Start Date | End Date | % Royalty | Minimum Guarantee |
|---|---|---|---|---|
| Year 6 | 01/01/10 | 12/31/10 | 4% | $400,000 |
| Year 7 | 01/01/11 | 12/31/11 | 4% | $400,000 |
| Year 8 | 01/01/12 | 12/31/12 | 4% | $400,000 |
| Year 9 | 01/01/13 | 12/31/13 | 4% | $400,000 |
| Year 10 | 01/01/14 | 12/31/14 | 4% | $400,000 |

(3) Advanced Payment: Upon LICENSEE's signing of this Agreement, there shall be due an Advance Payment of $150,000.00, which shall accrue against future earned royalties.

Marketing of the Products shall begin by January 1, 2005.

b) Payments: All payments made hereunder shall be by check or wire transfer made payable to EMI in U.S. dollars drawn on an American bank, as designated by DUPONT. Within thirty (30) days after the end of each calendar quarter, the royalties due hereunder will be remitted to EMI with a copy to DUPONT. If the royalties for any calendar quarter do not equal or exceed one-fourth of the Annual Minimum Payments for the year that includes such quarter, then the difference between one-fourth of such Annual Minimum Payments and such royalties ("Shortfall") will be remitted to DUPONT within thirty (30) days after the end of such calendar quarter.

After the payments are sent either by wire transfer or mail, LICENSEE shall notify the following via facsimile that such payments were made enclosing a copy of the wire transfer receipt or cover letter for mail payments together with the royalty and annual minimum payment calculations and sales reports as provided herein below:

1) E. I. du Pont de Nemours and Company
DuPont Corporate Public Affairs
1007 Market Street, D-11040
Wilmington, DE 19898
U.S.A.
Phone: (302)774-0187
Facsimile: (302) 773-2919
Attn: Lynne Chappel, DuPont Licensing Brand Manager
E-mail: lynne.chappel@usa.dupont.com

13

2) E. I. du Pont de Nemours and Company
1007 Market Street
Cashier's Office, Room D8003
Wilmington, DE 19898
U.S.A.
Telephone: (302) 892-0921
Facsimile: (302) 773-3763
Attention: Phil W. Bur

c) <u>Late Payments:</u> If any payments due are not timely paid, then LICENSEE shall pay interest on the amount owed at a rate of one and one-half percent (1.5%) per month (or the maximum rate allowed by law if lower) from the date such amount was due until it is paid. If it becomes necessary for DUPONT to undertake legal action to collect any such payments, LICENSEE shall pay DUPONT's reasonable legal fees and costs of the action and related negotiations if the legal action undertaken results in a determination that the payments were due.

d) <u>Records:</u>  LICENSEE shall keep adequate records in sufficient detail to enable the payments due to DUPONT hereunder to be determined. Said records shall be maintained for a period of three (3) years following submission of the Report to which such records pertain. Upon fifteen (15) days' prior written notice by DUPONT, LICENSEE shall permit said records to be inspected, and employees of LICENSEE associated with performance under this Agreement to be interviewed, at DUPONT's expense, at anytime during regular business hours by an independent auditor appointed by DUPONT, and reasonably accepted to LICENSEE. The auditor shall determine and report to DUPONT only the amount of the payments due and details concerning any underreporting, as well as adherence to any other requirements under the Agreement. If such audit discloses any underreporting, LICENSEE shall immediately pay DUPONT such underreported amount along with interest calculated pursuant to the terms set forth herein. If the audit determines an underpayment in excess of five percent (5%), LICENSEE shall reimburse DUPONT for the cost of the audit.

e) <u>Sales Reports:</u>  Within thirty (30) days following each calendar quarter, LICENSEE shall furnish to the same recipients as the payment designations specified above a complete and accurate statement, in a format acceptable to DUPONT, of sales of Products, subject to royalty hereunder, during the preceding calendar quarter. For each country within the Territory, the report shall specify the following: (1) a description of the Product; (2) unit price of the Product; (3) the number of units sold in each country; and (4) the amount due. Such report shall be submitted whether or not any sales of the Products occurred during the preceding calendar quarter. Payment shall be made at the same time as submission of the reports. The receipt or acceptance of any of the statements furnished or royalties paid by LICENSEE shall not preclude DUPONT from questioning their accuracy at any time during an audit.

f) <u>Tax Clause:</u> LICENSEE shall pay all taxes and charges imposed by any government or taxing authority (other than the United States of a subdivision thereof) with respect to payments by LICENSEE to DUPONT or transfer of rights hereunder. Notwithstanding the foregoing, to the extent LICENSEE is required by any applicable income tax law to withhold a portion of the payment owing to DUPONT hereunder, DUPONT shall accept the resulting net payment as due performance under this Agreement. LICENSEE shall, however, take all necessary steps to secure the benefit of any reduction of withholding tax rate available under treaty and shall promptly provide DUPONT with a receipt for any tax withheld. Receipts should be sent to:

> E. I. du Pont de Nemours and Company
> Federal and International Tax Operations
> DUPONT Finance, Room D-13188-3A
> Wilmington, DE 19898
> U.S.A.

g) <u>Currency Conversion:</u> Royalties shall be paid in United States (U.S.) currency. For converting into U.S. currency royalties accrued in non-U.S. currency, LICENSEE will convert the non-U.S. currency using the "Interbank Rate-median ask price" on the currency Internet web site at http://www.oanda.com/converter/classic for the business day two (2) days prior to the date of payment or, in case of late payment, the last business day of the quarter for which payment is being made.

EXHIBIT B

*Rules for Using the Trademarks*

RULE 1:  BE DISTINCTIVE.  Make the Trademarks distinctive from the surrounding text each and every time. Use only the distinctive forms of usage for the Trademarks that are provided by DuPont.

RULE 2:  SHOW REGISTRATION STATUS.  Show the proper registration status each and every time the Trademark appears.

Use "®" if the Trademark has been registered.  Use (™) if the trademark is not yet registered.

RULE 3:  AUTHORIZED USER -- LICENSING NOTICE. -- Use the licensing notice specified elsewhere in this Agreement.

RULE 4:  DO NOT CHANGE THE TRADEMARKS.  The Trademarks must be used only in the exact form in which registered.  Therefore, do not use as a possessive, hyphenate, separate or split even if at the end of a line of text.  Do not change the shape, size or style.

RULE 5:  DO NOT INCORPORATE A DUPONT TRADEMARK IN A DOMAIN NAME OR URL. You may refer to the trademark in your web site as part of the product portfolio you sell, but the Trademarks should not be used as a domain name or email address.

RULE 6:  At least once per page, use an appropriate generic term for the Trademarks.

<u>EXHIBIT C</u>

PRODUCT STEWARDSHIP RESPONSIBLE CARE® CODE OF MANAGEMENT PRACTICES

<u>Management Leadership and Commitment</u>

1. LEADERSHIP: Demonstrates senior management leadership through written policy, active participation and communication.

2. ACCOUNTABILITY and PERFORMANCE MEASUREMENT: Establishes goals and responsibilities for implementing product stewardship throughout the organization. Measures performance against these goals.

3. RESOURCES: Commits resources necessary to implement and maintain product stewardship practices.

<u>Information and Characterization</u>

4. HEALTH, SAFETY and ENVIRONMENTAL INFORMATION: Establishes and maintains information on health, safety, and environmental hazards and reasonably foreseeable exposures from new and existing products.

5. PRODUCT RISK CHARACTERIZATION: Characterizes new and existing products with respect to their risk using information about health, safety, and environmental hazards and reasonably foreseeable exposures. Establishes a system that initiates re-evaluation

<u>Risk Management</u>

6. RISK-MANAGEMENT SYSTEM: Establishes a system to identify, document, and implement health, safety and environmental risk-management actions appropriate to the product risk.

7. PRODUCT and PROCESS DESIGN and IMPROVEMENT: Establishes and maintains a system that makes health, safety and environmental impacts—including the use of energy and natural resources—key considerations in designing, developing and improving products and processes.

8. EMPLOYEE EDUCATION and PRODUCT USE FEEDBACK: Educates and trains employees, based on job function, on the proper handling, recycling, use, and disposal of products and known product uses. Implements a system that encourages employees to feed back information on new uses, identified misuses or adverse effects for use in product risk characterization.

9. CONTRACT MANUFACTURERS: Selects contract manufacturers who employ appropriate practices for health, safety and environmental protection for the operations under contract, or works with contract manufacturers to help them implement such practices. Provides information and guidance appropriate to the product and process risk to foster proper handling, use, recycling and disposal. Periodically reviews performance of contract manufacturers.

10. SUPPLIERS: Requires suppliers to provide appropriate health, safety and environmental information and guidance on their products. Factors adherence to sound health, safety, and environmental principles, such as those contained in Responsible Care into procurement decisions

17

11. DISTRIBUTORS: Provides health, safety and environmental information to distributors. Commensurate with product risk, selects, works with and periodically reviews distributors to foster proper use, handling, recycling, disposal and transmittal of appropriate information to downstream users. When a company identifies improper practices involving a product, it will work with the distributor to improve those practices. If, in the company's independent judgment, improvement is not evident, then the company should take further measures -- up to and including termination of the business relationship. This Management Practice should be implemented in conjunction with the Distribution Code of Management Practices.

12. CUSTOMERS AND OTHER DIRECT PRODUCT RECEIVERS: Provides health, safety and environmental information to direct product receivers. Commensurate with product risk, works with them to foster proper use, handling, recycling, disposal, and transmittal of appropriate information to downstream users. When a company identifies improper practices involving a product, it will work with the product receiver to improve those practices. If, in the company's independent judgment, improvement is not evident, then the company should take further measures -- up to and including termination of product sale.

3. Production/Shipping Sites
   a) Your sites
   b) Coproducers / Repackagers / contract manufacturers
   c) Distributors / resellers ? Brokers ?
   d) Terminals, warehouses
   e) Any major gaps in the trail?
   f) E –commerce?

4. Amount Sold (estimated approximate or ranges)

5. Describe End Users
   a) First Customer(s)
   b) Ultimate customer ?

H. **Hazard Characterization:**

What do we know? Assemble vendor data; internet searches; any literature searches for human and ecological toxicology; etc. If there is limited data, does this material have similar structure to other characterized materials? Would this suggest any concerns or data gaps to be filled?

1. Product Composition
   a) Have all intentionally added materials been identified? Have known impurities been identified based on risk?
   b) What systems would detect changes in product composition from manufacture or raw materials?

2. Physical Hazards
   a) Fire & Explosion; static potential
   b) Reactivity, Incompatibility, polymerization, corrosiveness, etc.

3. Human Toxicity Hazards
   a) Summary of acute and chronic data and significance for humans.
   b) Are there exposure limits for workers? For customers' workers? For the community?

      - For consumers? For sensitive sub-populations? (Children, elderly, etc.) Should there be?

   c) Have there been any TSCA 8 (c) allegations? (since the last review). What is the system to train and to collect this data? How were these resolved?
   d) Has any TSCA 8 (e) data become available?
   e) Have any calls (medical, emergency, allegations, etc.) to the company been made? If so what were they and how were they resolved?
   f) Other input?

4. Environmental Hazards
   a) What is known about where in the environment (water, air, sediment, and fish) the product(s) molecules end up? (and significant emissions from the product use).
   b) Has the DuPont P & B tool been used on all products and all materials in mixtures?
   c) What is the Persistence in the various media & the potential for Bioaccumulation?
   d) What is known about environmental toxicity to fish, daphnia, algae, etc? If there is no aquatic tests has ECOSAR aquatic model been run?

e) Based on emissions/ discharges from use and Reasonably Foreseeable Misuse and disposal: Has the risk from predicted environmental concentrations for the key components been assessed vs the predicted no effect environmental concentration? (This is generally the aquatic media and most sensitive species) If professional judgment – state that

f) Does this product have a global warming potential?    Or acid rain potential?

5. **Status of Global Chemical Inventories**
What countries will this product be sold into?  Are the product components listed on the inventories of the producing & destination countries?
a) Is this product registered in those countries were required?
b) What system is used to track compliance and to prevent orders from being placed for non- compliant materials? If not, how is this managed?
c) Any export/import controls?
d) See appendix A for TSCA specific questions (Company systems should be in place to cover these "reminders".

6. **Shipping & Storage Information & Requirements**
Is this regulated under international transport regulations? (DOT in the US; IMO for ocean shipment; IATA/ICAO for air)
a) Is there a strategy for packaging and carriers?
b) Are there Special requirements? Or labels? EG: gases that are released in storage?

7. **Spill and Emergency Response**
Is there an Emergency Response Plan (for humans & Environment) & capability for response and clean up along the routes in all countries where shipped?
a) What is the customer's capability to respond? Are there Reporting requirements? Are there any special procedures or equipment needed?
b) Should the company assist in training the user's employees

III.    <u>Toll or Contract Manufacturer Issues—Think Global</u>

1. What is the system to provide necessary SHE information to contract manufacturers?

(a) How have these Toll manufacturers been assessed for SH&E issues? Should their systems be reviewed on site?
(b) What protocol is used? – Was a trained assessor used?
(c) Is local exhaust ventilation needed?
(d) Is Protective equipment needed?

2. Does the contract describe who is responsible for distribution, use, disposal, spills, emergencies, labels, msds's?

3. Do these materials use DuPont labels & msds?

IV.    <u>Materials From Suppliers—Think Global</u>

1. How are the suppliers' SH&E systems assessed?  If suppliers are distributors how are they assessing their suppliers?

2. Are suppliers in developing nations used?  How has the company assessed them for SH&E issues and the potential for child or forced labor?  What is the path forward?

3.  Questions that DuPont uses with supplies are available upon request

V.    Distributor And Issues

1.  What system is in place to assess distributors? Does the business rely on distributors belonging to an initiative similar to Responsible Care?

2.  Does the product(s) have any unique hazards such that a visit may be appropriate? Do the distributors open, repackage, formulate, re-label material? Do they generate emissions or waste from our materials?

3.  Are there any SH&E concerns resulting from visits to/inspections of or feedback from distributors or carriers?

    (a)  Do their workers have potential exposure our product or gases or vapors or dusts from our product during mixing or processing? If so – What risk management techniques are used to protect their workers? Has the business assessed their exposure potential?
    (b)  Do they pass on MSDS and literature?
    (c)  Potential for misuse or improper use of product?
    (d)  Any regulatory issues? Any permits required?
    (e)  Emergency response at their site and in shipping?

4.  If we have restrictions on product end use, how do we know they are advising their customers?

    (a)  What is our feedback system?

VI.    MSDS/Label/Regulations/Training

1.  A MSDS for each individual product will need to be written. This is not a trivial process. What is the system for updating all the msds? - How will and how often will customers receive updated msds? Which customers ?

2.  What is the system to prepare and update labels? Has the consumer product labeling been assessed for compliance with regulations where it will be sold?   Have the hazardous substances been identified and are the warnings in agreement with FHSA (for US sales)?

    -    Has an assessment been done for label language that may go beyond regulations due to industry and Corporate standards / guidance? And RFM? - See #1B. If this will also be used in industrial settings does the label comply with ANSI and OSHA or country specific guidance/regulations?
    -    Are there any special regulatory issues, e.g.: Prop 65 or FIFRA or FDA, UL, FTC (for "green" claims), etc? Has an expert help develop those labels? (Significant time delays may be required for the necessary regulatory clearances).

3.  Have appropriate supplemental safety instructions such as: first aid guidance or spill clean up and disposal, fire fighting, storage, etc., been assessed and included if needed?

4.  Is the labeling sufficiently clear to insure comprehension by the various types of consumers? Is the labeling language understood by the users in various locations & countries? Should icons be used?

5. What is the system for obtaining and understanding the applicable regulations? - Have the available regulatory information (including global chemical inventories) for the chemical and similar chemicals; or polymer and similar polymers been assembled and reviewed, including a search of global regulatory databases  If not, what are the key data gathering and review needs? See part 1 of FPR.

6. Would this product be regulated under the various State (Calif, and others)' Federal and country regulations for VOC content?  This can be a complex issue;  Consult legal . Note the Refinish business has expertise on this topic.

7. Are any antimicrobial/ sanitization claims being made, and if so has the appropriate documentation been collected and the article been registered with the appropriate legal authorities? (Check country requirements: Biocide directive 98/8/EC or FDA, FIFRA in the USA)

8. Have the following been answered for each country the product will be sold in?

   (a) Have the stewards in those countries been informed and the country specific issues discussed?
   (b) Does the product contain components above the tolerated concentrations which are banned for consumers or which will require a special expertise of the reseller (EU directive 76/769/EEC).
   (c) Are the product and its components registered to the product register in various European countries?
   (d) Is the product labeled appropriately according to country laws and in local language?
   (e) Are the envisioned quantities of the product in compliance with country laws on storage?
   (f) Is the product in compliance with international rules (orange book of the UN) on transportation?
   (g) Is the product in compliance with country laws on disposal?  Consider used and unused product.
   (h) Are there country laws on packaging and package disposal?
   (i) Is the product in compliance with country laws on storage?
   (j) Are we in compliance with any import/export laws?
   (k) Are there country environmental laws that must be adhered to?
   (l) What are the chemical reporting laws of the country?
   (m) M/SDS available according to national legislation and in the local language?

VII. <u>Packaging / Stability / Distribution</u>

1. Has the packaging and its contents been assessed for stability covering reasonably foreseeable shipping, storage, usage, and disposal situations?  (freezing and high heat). Is a performance tested packaging certified by an appropriate authority, used in case the product is classified "dangerous for transportation"?

   - Does the packaging need to be child resistant (consult an expert)?
   - What is the anticipated shelf life of the product under reasonably foreseeable shipping, selling, storage, and usage conditions?  How long could it be expected to be in stores before being sold?  Under what conditions should it be stored?  (If not, what are the key data gathering and review needs?).

23

- Has the chemical, polymer, and product formulation been assessed for possible component interactions/ reactions, including possible negative impacts on phase stability and the ability to resist microbial growth?
- Note: In the EU a dangerous substance or preparations (mixtures) must have a tactile warning if they are offered to the general public and they are labeled: Very toxic or toxic (skull & crossbones); corrosive (symbol); harmful (St Andrews cross); highly flammable or flammable. Exempt are crop protection products. Consult with your EU steward.

2. See section V for questions on distribution. These are supplemental: Will the "big box" companies dictate the distributors? If so, how will the SHE systems be assessed?

VIII.    <u>Consumer Product End Use</u>

1. Briefly review what consumer end use(s) this product will be used for and how it will be used. Note the assessment of contract manufacturers, suppliers, shipping status, etc., should have been reviewed in previous sections.

     - Has this product application been discussed with legal?
     - Are there any patents we need to be aware of?

2. Have "reasonably foreseeable misuses" (RFM) or unanticipated usage scenarios been discussed and those that have "some" probability been assessed for risks (consult with legal)? This should include usage, storage, disposal, and unexpected combined use with other products.
E.G: What human (children, infirm, etc) and environmental Exposures (water, food, cosmetic, etc) might result from any misuses?
What risk management practices will be taken to address those RFMs that had "some" probability? (Note: these RM actions can be addressed as appropriate in the following questions.)

3. What experience in the marketplace with similar products, chemicals, or polymers has raised any actual or perceived issues?

4. Human Toxicity: (note: refer to the Hazard/ Toxicology section of the FPR part I). Will / could the Product be ingested, inhaled, or applied to the skin during use either intentionally or inadvertently?

     - If yes, in what quantities, how often, and for how long?
     - If yes, will the existing toxicity data or models - including persistence and bioaccumulation potentials - help insure the safety of these types, frequencies, and magnitudes of exposures? Or are there data gaps?
     - Skin contact applications usually need human patch testing (see Haskell)
     - Complete compositional information must be obtained from all suppliers. (See Section IV.) Check with your global chemical coordinator to determine if any new Compounds have been created (i.e., do formulated ingredients react?) Appropriate efficacy and stability testing should be available for this review.
     - Has any actual consumer testing indicated any safety (e.g., skin irritation) or other issues? (If yes, what are the plans to address the issues?)
     - Have the relevant components of the product formulation been assessed for possible matrix and mixture effects, e.g., is it possible that one or more chemicals have skin permeation enhancement properties?

24

- How will compliance with the EU used packaging regulations be met?

X.   Risk Perception and Risk Communication

1.  Have Web search engine results indicated any noteworthy public, activist group, or regulatory agency issues to address for the chemical, polymer or product, or for similar materials?  (If yes, have plans been developed to proactively address the issues?)

2.  Have you critically reviewed the product literature, especially ad copy and pictures with regard to the potential to mislead the consumer?  Look for implied end uses that might not be consistent with the appropriate safe end use and disposal.

    - Is the product literature/label consistent with the safety data sheet?

XI.   Sustainable Growth and Certifications/Endorsements

1.  What is the sustainable Growth strategy? What are the footprint metrics and the societal value for this product?

2.  Have possible certifications and endorsements of the chemical, polymer, and/or product been considered?  As examples, these could include a Good Housekeeping seal of approval or a Greenguard certification (for low-emission indoor products) from non-profit Greenguard Environmental Institute (www.greenguard.org)  Or Scientific Certification systems or Green Seal, etc

3.  The Consumer Product Safety Commission web site has useful case studies and recalls and the ability to search for products.  You should reference this for similar products. http://www.cpsc.gov/

XII.   Competition

1.  Do other companies offer the same or similar product or chemical for a similar purpose, or for different purpose? (If yes, would this increase the level of exposure impact in the environmental and human safety assessment in a meaningful way?)

2.  Could a competitor attempt to raise any safety or regulatory issues?  (If yes, have plans been developed to proactively address the issues?)

XIII.   Training and Feedback Systems

1.  Personnel Training

    a) How has the company stewardship coordinator been trained in stewardship?
    b) What system is used to train appropriate marketing/sales organization/technical service/customer contact personnel on the value of Product Stewardship?

        - Is there a system for retraining (suggest every 3 yrs)?  What about people moving into different roles?  Or new hires?

    c) Describe if any stewardship training of carriers, customers, downstream users has been done

26

2. Describe the feedback systems to capture stewardship issues (both positive and "of concern"). How are these assessed for risk and how is this documented? How will potential misuses be monitored?

3. What is the system for obtaining and responding to consumer's questions or concerns?

   - What is the medical emergency system?
   - What is the system for managing customer safety, health or environmental allegations?

4. What is the system to keep DuPont informed of feedback & stewardship issues? How frequently will this occur?

5. How will any reporting obligations under the Consumer Product Safety Act (Check specific countries for similar requirements) be identified and managed? How will corrective actions be managed?

XIV.  Risk characterization and Risk management

   If the business is satisfied that the risks have been identified and appropriately managed then the sign off sheet at the end should be signed.

Appendix A: TSCA Questions (note most of these also have value for information generated outside of the US)

1) What system does the business have in place to insure that timely TSCA section 12(b) Export notifications are filled with EPA? How is this system update as new product codes are added or compositions changed? Or when chemicals are added or sunset by EPA?

2) What training has been given to Technical service or field sales or marketing personnel in handling customer allegations of health or environmental effects alleged to be caused by these products?

3) What is the communication process when a customer rep learns of such an allegation?

   - After allegations are processed within the business what further review and follow up is done with these allegations (both those subject to TSCA 8c as well as allegations of known effects not qualifying as recordable)?

4) For health or environmental effect allegations on products received by global subsidiaries or JV's, what is the communication process within the business?

5) For both commercial product and sample shipments imported into the US, what system is in place to insure TSCA inventory compliance and correct TSCA certification (including samples shipped via express courier)

6) How do you keep track of health and safety studies for any section 8d requirements in case of a section 4 rule?

7) How do you notify customers of any TSCA requirements?

8) What checks and balances are in place to ensure global inventory requirements are met when product is bought or sold?

SIGN OFF SHEET

THE UNDERSIGNED VERIFY THAT:

A PRODUCT STEWARDSHIP REVIEW WAS CONDUCTED FOR _____
(Note this should be used for both existing products and new products & applications or end uses)

Date Conducted_____

- The product review information is available _____ or electronically at _____
- The formal product review action items and names of responsible people assigned to the action items is available at _____ (or electronically at _____ )
- The next product review is due _____(quarter / yr )

This product is cleared for sale into the application(s) and end uses discussed in this product review.

_____ Business manager
_____ Product manager
_____ Product steward
_____ Legal

DJG/rtp/dr 4-13-04

S:\Tmark\Gould, David\DuPont Brand Trademark License Agreements\SEALMASTER DuPont™ Brand Trademark License 4-13-04 doc

# Morris James LLP

James W. Semple
302.888.6870
jsemple@morrisjames.com

June 4, 2008

**Registered Mail,**
**Return Receipt Requested**
**and First Class Mail**

Equity Management, Inc.
4365 Executive Drive
Suite 100
San Diego, CA 92121

   Re: E. I. du Pont de Nemours and Company v.
     Equity Management, Inc.
     Delaware Superior Court
     C.A. No. 08C-05-120 JEB

Dear Sir/Madam:

  Acting as counsel for E. I. du Pont de Nemours and Company, we have filed suit against Equity Management, Inc. in the Superior Court of the State of Delaware.  In accordance with the provisions of 10 *Del. C.* § 3104, we are forwarding the summons, complaint and other required notices and documents.

  Service of the Complaint was made on the Secretary of the State of Delaware on May 30, 2008 and returned to the Superior Court on June 2, 2008.  Such service is effective as if it had been made upon a non-resident personally within the State of Delaware.

  We suggest that you deliver these papers immediately to your attorney.

       Very truly yours,

       James W. Semple

JWS/mmt
Enclosures

1815959/1



EFiled: May 16 2008 12:06PM EDT
Transaction ID 19862665
Case No. 08C-05-120 JEB

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| E. I. DU PONT DE NEMOURS | ) | |
| AND COMPANY, a Delaware | ) | |
| corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| EQUITY MANAGEMENT, INC., | ) | |
| | ) | |
| Defendant. | ) | **SUMMONS** |

THE STATE OF DELAWARE
TO SPECIAL PROCESS SERVER
YOU ARE COMMANDED:

To issue summons and complaint on the above named defendant Equity Management, Inc., so that, within 20 days after service hereof upon defendant, exclusive of the day of service, defendant shall serve upon James W. Semple, Esquire, attorney for plaintiff, whose address is 500 Delaware Avenue, P.O. Box 2306, Wilmington, DE 19899, an answer to the Complaint.

To serve upon defendant a copy hereof and of the Complaint.

Dated: 5/28/08

SHARON AGNEW

Per Deputy

TO THE ABOVE NAMED DEFENDANT:

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve upon third-party plaintiffs' attorney named above an answer to the Complaint (and, if an affidavit of demand has been filed, an affidavit of defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the affidavit of demand if any).

Dated:

SHARON AGNEW

Per Deputy

JWS/020001-0131/1756360/1

# *RETURN OF SERVICE*

**CASE NO:**        08C-05-120 JEB

**SERVED:**        EQUITY MANAGEMENT, INC.

**DOCUMENT:**        SUMMONS & COMPLAINT

**ADDRESS:**        C/O THE DELAWARE SECRETARY OF STATE  TOWNSEND BLDG.  DOVER, DE

**DATE:**        5/30/08

## MANNER OF SERVICE

☒    **PERSONAL:**        ACCEPTED BY:   KAREN CHARBENEAU

☐    **SUBSTITUTE:**

☐    **NO SERVICE:**

2008 JUN -2 AM 11: 11
FILED PROTHONOTARY

_____

GRANVILLE MORRIS

BRANDYWINE PROCESS SERVERS, LTD
PO BOX 1360
WILMINGTON DE 19899
302-475-2600

SWORN TO BEFORE ME ON   5/30/08

_____
NOTARY PUBLIC

*KEVIN DUNN*
*NOTARY PUBLIC*
*STATE OF DELAWARE*
*MY COMMISSION EXPIRES NOV. 23, 2010*

*BRANDYWINE PROCESS SERVERS, LTD  PO BOX 1360  WILMINGTON, DE 19899*

**302-475-2600**

JS 44 (Rev 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM )

## I. (a) PLAINTIFFS

**E.I. DUPONT DE NEMOURS AND COMPANY**

(b)  County of Residence of First Listed Plaintiff  _New Castle_
(EXCEPT IN U S  PLAINTIFF CASES)

(c)  Attorney's (Firm Name, Address, and Telephone Number)
Jeffrey L  Moyer, Esquire
Steven J  Fineman, Esquire
Richards, Layton & Finger
One Rodney Square - P O  Box 551
Wilmington, DE 19899
302-651-7700

## DEFENDANTS

**EQUITY MANAGEMENT, INC.**

County of Residence of First Listed Defendant_____
(IN U S  PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an °X° in One Box Only)

- O 1  U.S. Government Plaintiff
- O 2  U.S. Government Defendant
- O 3  Federal Question (U.S. Government Not a Party)
- ● 4  Diversity (Indicate Citizenship of Parties in Item III)

## III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an °X° in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ● 1 | O 1 | Incorporated or  Principal Place of Business In This State | O 4 | O 4 |
| Citizen of Another State | O 2 | ● 2 | Incorporated and  Principal Place of Business In Another State | O 5 | O 5 |
| Citizen or Subject of a  Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. NATURE OF SUIT (Place an °X° in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| O 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | O 610 Agriculture | O 422 Appeal 28 USC 158 | O 400 State Reapportionment |
| O 120 Marine | O 310 Airplane | O 362 Personal Injury - Med. Malpractice | O 620 Other Food & Drug | O 423 Withdrawal 28 USC 157 | O 410 Antitrust |
| O 130 Miller Act | O 315 Airplane Product Liability | O 365 Personal Injury - Product Liability | O 625 Drug Related Seizure of Property 21 USC 881 | | O 430 Banks and Banking |
| O 140 Negotiable Instrument | O 320 Assault, Libel & Slander | O 368 Asbestos Personal Injury Product Liability | O 630 Liquor Laws | **PROPERTY RIGHTS** | O 450 Commerce |
| O 150 Recovery of Overpayment & Enforcement of Judgment | O 330 Federal Employers' Liability | | O 640 R.R. & Truck | O 820 Copyrights | O 460 Deportation |
| O 151 Medicare Act | O 340 Marine | **PERSONAL PROPERTY** | O 650 Airline Regs. | O 830 Patent | O 470 Racketeer Influenced and Corrupt Organizations |
| O 152 Recovery of Defaulted Student Loans (Excl  Veterans) | O 345 Marine Product Liability | O 370 Other Fraud | O 660 Occupational Safety/Health | O 840 Trademark | O 480 Consumer Credit |
| O 153 Recovery of Overpayment of Veteran's Benefits | O 350 Motor Vehicle | O 371 Truth in Lending | O 690 Other | **LABOR** | O 490 Cable/Sat TV |
| O 160 Stockholders' Suits | O 355 Motor Vehicle Product Liability | O 380 Other Personal Property Damage | | O 710 Fair Labor Standards Act | O 810 Selective Service |
| ● 190 Other Contract | O 360 Other Personal Injury | O 385 Property Damage Product Liability | | O 720 Labor/Mgmt. Relations | O 850 Securities/Commodities/ Exchange |
| O 195 Contract Product Liability | | | | O 730 Labor/Mgmt. Reporting & Disclosure Act | O 875 Customer Challenge 12 USC 3410 |
| O 196 Franchise | | | | O 740 Railway Labor Act | O 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | O 790 Other Labor Litigation | O 891 Agricultural Acts |
| O 210 Land Condemnation | O 441 Voting | O 510 Motions to Vacate Sentence | | O 791 Empl. Ret. Inc Security Act | O 892 Economic Stabilization Act |
| O 220 Foreclosure | O 442 Employment | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | O 893 Environmental Matters |
| O 230 Rent Lease & Ejectment | O 443 Housing/ Accommodations | O 530 General | | O 870 Taxes (U S  Plaintiff or Defendant) | O 894 Energy Allocation Act |
| O 240 Torts to Land | O 444 Welfare | O 535 Death Penalty | | O 871 IRS—Third Party 26 USC 7609 | O 895 Freedom of Information Act |
| O 245 Tort Product Liability | O 445 Amer  w/Disabilities - Employment | O 540 Mandamus & Other | **IMMIGRATION** | | O 900 Appeal of Fee Determination Under Equal Access to Justice |
| O 290 All Other Real Property | O 446 Amer  w/Disabilities - Other | O 550 Civil Rights | O 462 Naturalization Application | | O 950 Constitutionality of State Statutes |
| | O 440 Other Civil Rights | O 555 Prison Condition | O 463 Habeas Corpus - Alien Detainee | | |
| | | | O 465 Other Immigration Actions | | |

_(SOCIAL SECURITY: O 861 HIA (1395ff), O 862 Black Lung (923), O 863 DIWC/DIWW (405(g)), O 864 SSID Title XVI, O 865 RSI (405(g)))_

## V. ORIGIN (Place an °X° in One Box Only)

- O 1  Original Proceeding
- ● 2  Removed from State Court
- O 3  Remanded from Appellate Court
- O 4  Reinstated or Reopened
- O 5  Transferred from another district (specify)
- O 6  Multidistrict Litigation
- O 7  Judge from Magistrate Judgment

Appeal to District

## VI. CAUSE OF ACTION

Cite the U S  Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity)

Brief description of cause:  Breach of Contract

## VII. REQUESTED IN COMPLAINT:

O CHECK IF THIS IS A CLASS ACTION

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ● Yes  No O

## VIII. RELATED CASE(S) IF ANY

(See instructions):

DOCKET NUMBER:

DATE  July 2, 2008

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG JUDGE_____

JS 44 Reverse (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U. S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**I. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U S C 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U S C 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**II. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V. Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U S C, Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U S C Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U S C Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U S. Civil Statute: <u>47 USC 553</u>
Brief Description: <u>Unauthorized reception of cable service</u>

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F R Cv P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.